**Robert L. KOHLS and Louise A. Kohls, Plaintiffs,**

v.

**Angus M. DUTHIE, Mark D. Lerdal, Gerald R. Alderson and Charles Christenson, Defendants, and**

**Kenetech Corporation, Nominal Defendant.**

**Civ.A. No. 17762–NC.**

Court of Chancery of Delaware, New Castle County.

Submitted: April 20, 2000.

Decided: July 26, 2000.

---

Edward M. McNally and John T. Meli, Jr., Morris, James, Hitchens & Williams LLP, Wilmington, for Plaintiffs.

Charles F. Richards, Jr., Raymond J. DiCamillo and Thad J. Bracegirdle, Richards, Layton & Finger, Wilmington, for Defendants.

## OPINION

LAMB, Vice Chancellor.

### I. INTRODUCTION

In October 1997, the largest holder of Kenetech Corporation common stock advised Kenetech's President and CEO, Mark D. Lerdal, who was also a director, that it was "shopping" its 12.8 million share block (over 30% of the common outstanding) and meant to sell those shares by year-end. The other directors also learned of these facts and considered purchasing the shares jointly. They and Lerdal also knew that the block could be

acquired at a nominal price. Without formally meeting to analyze Kenetech's options, the directors failed to cause Kenetech to take advantage of the opportunity to buy those shares. Rather, in December 1997, Lerdal purchased the shares for a mere $1,000.

Plaintiffs Robert L. and Louise A. Kohls, who are Kenetech stockholders, filed this derivative action on February 3, 2000, seeking to enforce the company's right to purchase those shares. The Kohls assert that the 12.8 million Kenetech shares were worth far more than $1,000 when purchased from Hillman and are now valued at over $8.2 million. The Kohls allege that the opportunity to buy the shares belonged to Kenetech and that Lerdal breached his duty of loyalty by appropriating it for himself. They also claim that the other directors breached their fiduciary duties to Kenetech by their acquiescence in Lerdal's action and their failure properly to pursue and protect Kenetech's interests in exploiting the opportunity presented.

By the time the Kohls filed this action, two of the directors had resigned from the Kenetech board and been replaced with new outside directors. A third, Charles A. Christenson, remained on the Kenetech board.

The defendants in this action filed a motion to dismiss for failure to state a claim and failure to comply with the demand requirement of Rule 23.1. For the reasons set forth below, I deny defendants' motions.

## II. FACTUAL BACKGROUND [1]

### A. The Parties

Plaintiffs Robert L. and Louise A. Kohls have purportedly been Kenetech stockholders at all times relevant to this action.

Nominal Defendant Kenetech is a Delaware corporation with its principal office in San Francisco, California. As of October 30, 1999, Kenetech had 41,919,218 outstanding shares of common stock. The Hillman Company, which is not a party to this action, held about 30% of those shares at the time of the events described herein.

Defendant Mark D. Lerdal has been a Kenetech director and its President and CEO, since 1996. In 1997, Lerdal received a substantial cash severance payment from Kenetech. He was not, however, terminated.[2]

Defendant Charles A. Christenson is now and has since 1980 been a Kenetech director. Defendants Angus M. Duthie and Gerald R. Alderson were the other two board members at the time of the matters alleged, but terminated their directorial roles as of August 18, 1999. Duthie and Alderson were replaced on the Kenetech board by two outside, independent directors.

### B. The Hillman Offer

Kenetech historically operated in the electric utility market. Beginning in 1995, Kenetech's business deteriorated significantly. Over time, Kenetech sold off most of its assets and ceased most of its operations. In June 1996, Kenetech defaulted

1. The facts recited herein are taken from the complaint. Solely for the reader's convenience, I include and identify certain background facts found in this court's Opinions in either *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, Del. Ch., C.A. No. 16362, 1999 WL 893575, Steele, V.C. (Oct. 13, 1999),

*aff'd,* Del.Supr., 751 A.2d 878 (2000) (ORDER), or *Kohls v. Kenetech Corp.*, Del.Ch., 791 A.2d 763 (2000).

2. As I noted during oral argument, such arrangements are not unheard of and, if properly approved, are presumably valid.

on $99 million worth of its Senior Notes. Thus, Kenetech faced the threat of an involuntary bankruptcy.

In October 1997, a Hillman representative contacted Lerdal, stating that it was prepared to sell its approximately 13 million Kenetech shares for a nominal price. Lerdal expressed his personal interest in such a transaction. Another Hillman representative contacted one or more of the other directors who then discussed the possibility of all four Kenetech directors jointly purchasing the shares. Lerdal discouraged these discussions.[3]

In December, Hillman again contacted Lerdal and told him that Hillman had not found a buyer. Lerdal agreed to buy the shares for $1,000 and the transaction closed before year-end.[4] Plaintiffs allege that at the then-trading price of $0.065, those shares were valued at over $800,000. It is alleged that the board never met to consider whether Kenetech could or should take the opportunity to purchase the shares itself. It is alleged, however, that Lerdal told the other directors, outside the context of a board meeting, that Kenetech could not purchase the shares for a variety of reasons, all relating to its poor financial condition. These reasons included: the prohibition found in § 160(a)(1) of the Delaware General Corporation Law against a corporation repurchasing shares at a time when its capital is impaired, restrictive covenants found in Kenetech's Senior Notes, and certain protective provisions of Kenetech's charter relating to a series of preferred stock denominated as PRIDES.[5] The complaint alleges that since the board never met to consider the question of repurchasing the block of shares, it never obtained independent legal, financial or accounting advice on the subject. Plaintiffs also allege that the reasons identified by Lerdal did not, in fact, prevent Kenetech from purchasing the shares.

## C. The Eco–Electrica Sale

By the time of Hillman's offer, Kenetech had sold-off a large part of its assets but retained its one-half interest in an electric plant project called Eco–Electrica.[6] In December 1997, *just prior to the challenged stock purchase,* Kenetech obtained construction financing for the project, thus increasing its value significantly. In December 1998, Kenetech closed a sale of its Eco–Electrica interest, realizing $252 million in the transaction. Kenetech's market value has risen accordingly. Thus, Ler-

---

**3.** Vice Chancellor Steele found that when the other directors wanted to participate in the opportunity, "Lerdal resisted on the grounds that director Alderson and Hillman Co.'s representatives were on bad terms." *Quadrangle* at 14.

**4.** Vice Chancellor Steele quoted Lerdal's surprisingly blunt testimony about how he closed the stock purchase with Hillman in December 1997:

"I got a call from Mark Laskow [Hillman's representative], who said, 'We haven't been able to dump these things.'
I said, 'Well, I would be interested in buying them.'
He said, 'Okay.'
And I said, 'What do you want me to pay?'

He said, 'A thousand bucks, $5,000. It's sort of irrelevant.'
I said, 'I'll pay a thousand.'
And that is how *the negotiation* went."
*Quadrangle* at 15 (emphasis in original).

**5.** "PRIDES" is an acronym referring to Kenetech's Preferred Redeemable Increased Dividend Equity Securities.

**6.** Though not directly pertinent to this Opinion, the Notes holders agreed not to force Kenetech into bankruptcy because of their understanding that by allowing Kenetech to obtain certain financing and regulatory approval for this project, the amount Kenetech could realize in any sale would increase substantially, thus making more likely a full satisfaction of the debt.

dal's shares purchased from Hillman for $1,000 are now worth well over $8 million.

## III. The Parties' Contentions

The defendants moved to dismiss the complaint on the ground that the demand upon the board required by Court of Chancery Rule 23.1 was neither made nor excused. Defendants concede Lerdal's interest in a demand but argue that the other 3 members of the 4–man board of directors are disinterested and independent and, therefore, demand was required. Defendants point out that half of the Kenetech board at the time of Lerdal's stock purchase has been replaced and argue that plaintiffs fail to show that Christenson is either interested in that transaction or controlled by Lerdal.

Defendants also moved to dismiss the complaint for failure to state a valid corporate opportunity claim, relying on the Delaware Supreme Court's opinion in *Broz v. Cellular Information Systems, Inc.*[7] First, they say, Kenetech's capital was impaired, so it could not statutorily repurchase its own shares.[8] Second, the provisions of its debt instruments prevented a repurchase. Third, the PRIDES Certificate of Designations prevented Kenetech from repurchasing any of its common shares at a time the PRIDES dividends were in arrears. Finally, defendants argue, Kenetech had no expectancy in the opportunity. For each of those reasons, Lerdal could purchase the shares without concern for Kenetech's interest therein.

Plaintiffs counter by arguing that Lerdal's usurpation of the extraordinary opportunity for Kenetech to repurchase one-third of its shares for nominal consideration (and the other directors' complicity in the same) evidences faithless conduct. Plaintiffs argue that Kenetech's capital was impaired only because it carried its Eco–Electrica investment at a mere $19.5 million book value. The directors knew that Eco–Electrica's fair value was at least $200 million and that a revaluation would produce over $48 million in surplus.

Plaintiffs also claim that no properly motivated director would believe that either the preferred stockholders or the Senior Notes holders would have prevented Kenetech from making a $1,000 purchase of one-third of its stock. First, the PRIDES holders had an interest in seeing the purchase made because they were imminently confronting a mandatory conversion into common.[9] Second, since the board had already obtained the Senior Notes holders' consent to over $1 million in bonus payments to Kenetech's officers, it stood to reason that they would allow a mere $1,000 payment to buy the stock. In any event, since Kenetech was already in default, plaintiffs' contend that those holders could attain no additional rights by virtue of an unauthorized $1,000 share repurchase. Further, plaintiffs argue, even if the PRIDES holders' and Senior Notes holders' respective cooperation could not be presumed, the opportunity to buy one-third of the company for $1,000 provided such a great benefit to Kenetech's stockholders that the board was required to efficiently breach those contracts.

Plaintiffs then argue that demand was excused at the time they filed their com-

---

7. Del.Supr., 673 A.2d 148 (1996).

8. *See* 8 *Del. C.* § 160.

9. As discussed in greater detail in the Companion Opinion and in *Quadrangle,* the PRIDES holders faced a mandatory conversion of their preferred shares to common stock on May 14, 1998. Thus, their interest was consonant with the common stockholders' interest in consolidating their pro rata ownership of the corporation.

plaint because there was not a disinterested and independent majority of directors on whom to make such a demand. Lerdal is concededly conflicted because he actually bought the stock. Christenson is also conflicted, plaintiffs argue, because of his knowledge of the operative facts and his failure (and that of defendants Duthie and Alderson) to take steps to protect the interests of Kenetech in making the purchase.

## IV. ANALYSIS

### A. Standards

 In order to survive a motion to dismiss under Court of Chancery Rule 12(b)(6), the complaint must allege facts that, if true, establish every element of a claim upon which relief can be granted.[10] For Rule 12(b)(6) purposes, a complaint need only provide "a short and plain statement" of the facts supporting relief.[11]

 Plaintiffs sue derivatively but did not make a pre-suit demand on the board. Rule 23.1 requires that the complaint allege "with particularity," the justification for not making a demand.[12] This heightened pleading standard exists because "the derivative suit impinges on the managerial freedom of directors."[13] In order to assert a claim on behalf of the corporation, a plaintiff stockholder must show that "the directors are under an influence which sterilizes their discretion"[14] or "are incapable of making an impartial decision regarding such litigation."[15]

In *Aronson v. Lewis*, the Delaware Supreme Court articulated a two-part test for demand excusal: as a general rule, demand is excused where the complaint alleges, with particularity, facts that establish a reasonable doubt that either (a) the directors are disinterested and independent, or (b) the challenged transaction is otherwise the product of a valid exercise of the directors' business judgment.[16]

Central to this analysis is the operation of the business judgment rule. This is self-evident as to the second prong. But it is equally true of the first. "As to the [first prong] inquiry, directorial independence and disinterestedness, the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board."[17] Relatedly, the *Aronson* court also pronounced that the mere fact that directors would be asked to sue themselves is not a basis for excusing demand.[18] Nor is it sufficient to allege that the directors had voted to approve the transaction at issue.[19] Rather, the complaint must allege "specific facts establishing that the potential for liability is not 'a mere threat' but instead may rise to 'a substantial likelihood.'"[20] These general state-

---

**10.** *In re Santa Fe Pac. Corp. Shareholders Litig.*, Del.Supr., 669 A.2d 59, 65 (1995).

**11.** Ct. Ch. R. 8(a).

**12.** Ct. Ch. R. 23.1; *see also Brehm v. Eisner*, Del.Supr., 746 A.2d 244, 254 (2000).

**13.** *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984).

**14.** *Id.* at 814.

**15.** *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 932 (1993).

**16.** *Aronson*, 473 A.2d at 814.

**17.** *Id.*

**18.** *Id* at 815; *see also Brehm*, 746 A.2d at 257 n. 34.

**19.** *Aronson*, 473 A.2d at 817.

**20.** Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9–2(b)(3)(iii), 570 (1998) (quoting *Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 815)) (hereinafter "Wolfe & Pittenger").

ments may be seen as flowing from the premise that, where business judgment protection is available, a mere threat of personal liability resulting from one's participation as a director in approving a transaction should not suffice to sterilize a director's discretion.

The *Aronson* court ruled as follows:

In sum the entire review is factual in nature. The Court of Chancery in the exercise of its sound discretion [21] must be satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. Only in that context is demand excused.[22]

While *Aronson*'s focus on the business judgment rule serves well in most cases, the Delaware Supreme Court has recognized, most notably in *Rales v. Blasband*,[23] the existence of situations in which the *Aronson* analysis cannot apply. This is so, for example, "where the absence of any action or decision on the part of the board to which the demand would be addressed 'makes it impossible to perform the essential inquiry contemplated by *Aronson*'"[24] —whether the presumption of the business judgment rule applies to the challenged transaction. Pertinently, the *Rales* court

concluded that the *Aronson* test should not be applied "where the subject of the derivative suit is not a business decision of the board."[25]

■ Of course, recognizing that the *Aronson* test cannot be applied in a given situation does not lead the conclusion that demand is excused. Rather, as the Supreme Court said in *Rales:*

Instead, it is appropriate in these situations to examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations. Thus, *a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.* If the derivative plaintiff satisfies this burden, then demand will be excused as futile.[26]

It has been observed that this "simple and straightforward inquiry would seem to be the very issue that *Aronson,* in its more mechanical and roundabout way, was intended to resolve."[27] Moreover, because this formulation is one of general applica-

---

21. In *Brehm,* the Supreme Court overruled this aspect of *Aronson* and its progeny, holding that *de novo* review applies to a Rule 23.1 analysis. *Brehm,* 746 A.2d at (253).

22. *Aronson,* Del.Supr., 473 A.2d at 815.

23. Del.Supr., 634 A.2d 927 (1993).

24. *Wolfe & Pittenger,* § 9–2(b)(3)(iii), 578 (quoting *Rales,* 634 A.2d at 933).

25. *Id.* at 934. *Rales* also recognized that the *Aronson* test cannot be applied "where a business decision was made by the board of a company, but a majority of the directors making that decision have been replaced" by the time the complaint is filed. *Id.* at 934. Here,

only 2 of the 4 directors had been replaced in the interim period. Thus, all other things being equal, the *Aronson* test could still be applied in this case to assess whether the remaining directors—Lerdal and Christenson—are "conflicted" for purposes of considering a demand. Finally, *Rales* recognized that the *Aronson* test should not apply where "the decision being challenged was made by the board of directors of a different corporation." *Id.*

26. *Id.* at 934 (emphasis added).

27. *Wolfe & Pittenger,* § 9–2(b)(3)(iii), 580.

tion (and can as easily be applied in the business judgment rule context addressed in *Aronson*), "it is arguable that the current state of the law is conceptually inverted and that it would be both simpler and more direct to regard the original *Aronson* analysis as a subpart of the more generally applicable and flexible principle set forth in *Rales*." [28]

For present purposes, I need not wrestle with this last observation because I am persuaded by my review of the amended complaint and the parties' arguments that the Kenetech board of directors did not make a business decision in 1997 regarding the purchase of the Hillman block of shares by either Kenetech or Lerdal. Thus, the *Aronson* test is irrelevant and I will analyze the demand issue under the standard articulated in *Rales*—whether the board can consider a demand "without being influenced by improper considerations." [29]

## B. Can a Majority of the Kenetech Board Consider a Demand?

It is uncontested that half of the present board is presumed capable of impartially considering a demand. It is equally clear that Lerdal is conflicted from doing so. The question of demand futility thus turns on Christenson.[30]

### 1. Is Christenson Beholden to Lerdal?

■ Plaintiffs acknowledge that Christenson was not financially interested in Lerdal's stock purchase. Nevertheless, arguing by analogy to the first prong of *Aronson*, plaintiffs say that Christenson is "beholden" [31] to Lerdal and, thus, not independent. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." [32] Thus, plaintiffs must show facts tending to suggest that Christenson is so dependent on Lerdal (ordinarily by virtue of financial, familial or other relationships [33]) as to "sterilize" [34] his ability to consider a demand in this case.

Plaintiffs present two reasons that allegedly prove Lerdal's domination of Christenson. First, they point to Christenson's vote in favor of Lerdal's generous severance agreement that was paid to Lerdal despite the fact that he did not leave or change his job with the company, and that provided for Kenetech to pay his taxes with respect to that benefit. I cannot conclude that Christenson's vote on this matter shows his domination by Lerdal. First, agreements of this nature are not entirely uncommon and there is nothing inherently improper about them. More importantly, Christenson, an outside director, was simply one of a unanimous board (other than Lerdal) to approve the transaction. Finally, Christenson's ability *to control or influence control* over Lerdal's compensation would ordinarily be more suggestive of his domination and control over Lerdal, not the opposite inference suggested by plaintiffs here.[35]

28. *Id.*

29. *Rales,* 634 A.2d at 934.

30. *See Beneville v. York,* Del.Ch., C.A. No. 17638, 769 A.2d 80, Strine, V.C. (2000) (holding that where half the board is conflicted, demand is excused).

31. *Rales,* 634 A.2d at 936.

32. *Aronson,* 473 A.2d at 816.

33. *See generally White v. Panic,* Del.Ch., C.A. No. 16800, mem. op. at 16–20, 2000 WL 85046, Lamb, V.C. (Jan. 19, 2000).

34. *Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991).

35. *See Rales,* 634 A.2d at 937 (holding that director whose substantial compensation from his position with a different corporation may be controlled by an interested defendant

Plaintiff's second argument is that Christenson's conduct with respect to the challenged transaction is so inexplicable that it supports an inference that Lerdal controls him. I agree that the unusual nature of the corporate opportunity described in the complaint is properly considered in weighing whether or not Christenson is "conflicted" for purposes of considering a demand. However, this argument will be considered as part of the second part of my *Rales* inquiry, discussed below.

## 2. Is Christenson "Interested" in the Demand Itself?

■ Although Christenson is neither interested in the challenged transaction nor beholden to Lerdal, the demand futility analysis is not complete. Is Christenson, by virtue of a "substantial threat" of personal liability, interested in the decision to bring the litigation, so as to leave him conflicted from impartially evaluating a demand?[36] On the basis of the matters properly alleged in the complaint, I conclude that he is.

This case presents a highly unusual set of facts that color my decision on this motion. The complaint does not allege merely the opportunity to repurchase shares of stock at market price. Rather, the complaint alleges the forfeiture or usurpation of an opportunity for the corporation to realize a substantial windfall for the benefit of its stockholders.

- The company's CEO learned that its 30% shareholder was anxious to sell its position and was willing to do so for next to nothing. The CEO wanted to buy the shares *himself.* The other members of the board of directors also learned of this opportunity and jointly considered purchasing it, *in their personal capacities.*

- The CEO consulted with counsel and gave the other directors a series of reasons why the company could not buy the shares. The complaint alleges (in a conclusory fashion) that these reasons were false on their face and could not have been believed by the others, including Christenson.[37] Moreover, it is alleged that Christenson (and, I infer, the board as a whole) "failed to obtain competent legal, financial or accounting advice." The CEO then convinced the others to let him take the deal alone. *Those shares were allegedly worth many times the price paid for them, and are now worth over 8,000 times their cost to the CEO.*

Plaintiffs argue that Christenson faces a substantial threat of personal liability because his "inexplicable indifference to the interests of the Company in this matter ... implicate[s] his duty of loyalty to Kenetech and ... amounts to bad faith ...."

is considered beholden, and conflicted from considering a demand).

**36.** In a way, this inquiry is related to the second prong of the *Aronson test.* Under *Aronson,* the court determines whether the defendant will enjoy the protection from liability that exists when the business judgment rule stands unrebutted. If those protections will not apply, the court will infer that the director will be unable to consider impartially the corporation's interest in bringing the litigation because of his own interest in avoiding that litigation. Relatedly, when there is no challenge to a business *judgment,* as is the case here, the question becomes whether the director faces a substantial threat of personal liability *due to his alleged conduct or lack thereof.*

**37.** The fact that the complaint is not particularly pleaded in this regard does not require dismissal. Rather, I consider only the particularly pleaded facts in the complaint, and analyze whether, as a matter of law, the hurdles identified by Lerdal are valid.

Plaintiffs also argue that a "director's duty of loyalty may also be implicated where directors who do not benefit from a transaction nevertheless act with 'indifference to their duty to protect the interests of the corporation and its minority shareholders.' "[38] Put simply, plaintiffs assert that no properly motivated director could have perceived this corporate opportunity and not thoroughly inquired into the company's ability to exploit it.

Later in this opinion, I deny defendants' motion to dismiss the complaint for failure to state a claim for usurpation of a corporate opportunity. Suffice it to say for now that I am satisfied that the complaint does state a claim against all of the defendants relating to Lerdal's alleged usurpation of a corporate opportunity. Even applying Rule 23.1's heightened pleading standard, I conclude that the allegations of the complaint, if true, would establish that Christenson faces a "substantial likelihood"[39] of personal liability for breach of fiduciary duty and aiding and abetting Lerdal's breach of duty.[40]

In *Broz v. Cellular Information Systems, Inc.*, the Supreme Court made clear that the failure to *formally* present an opportunity to the corporate board cannot be the sole basis for imposing liability.[41] I take this to mean that, by analogy, a board's failure formally to consider an opportunity does not, alone, amount to a breach of duty on the directors' part. Nevertheless, the Kenetech board's apparent acceptance of Lerdal's assertions at face value, without conduct-ing any independent analysis or seeking independent advice, tends to show a disregard for corporate interests. After all, independent accountants and lawyers may have been able to structure an acceptable transaction for Kenetech.

In the context of the well-pleaded allegations of the complaint, particularly the highly valuable nature of the opportunity to Kenetech and its stockholders, I am satisfied that Christenson is "conflicted" for purposes of considering a demand. Since only half of the present board is capable of impartially considering a demand, such exercise is excused as futile.

## C. Does the Complaint State a Claim for Usurpation of a Corporate Opportunity?

Giving fair consideration to the arguments of the parties, I conclude that the complaint states a claim upon which relief can be granted, within the meaning of Rule 12(b)(6). Thus, I do not accept, at this stage of the proceedings, defendants' multiple explanations why the corporate opportunity doctrine is not relevant to this case.

The basic framework of Delaware's corporate opportunity doctrine was laid down by the Delaware Supreme Court in *Guth v. Loft, Inc.*, as follows:

> if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in

---

**38.** Pl. Ans. Br. at 13 (quoting *Strassburger v. Earley*, Del. Ch., C.A. No. 14267, 2000 WL 128934, Jacobs, V.C. (Jan. 27, 2000)).

**39.** *Aronson*, Del.Supr., 473 A.2d at 815.

**40.** Defendants assert that because this court can simply require Lerdal to transfer the shares to the company as a remedy, Christen-son does not face personal liability. Defendants misinterpret the complaint, which clearly requests, to the extent the stock cannot be transferred, that *all of the defendants* be held *jointly and severally liable* to Kenetech.

**41.** Del.Supr., 673 A.2d 148, 152, n. 5 (1996).

which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.[42]

Of course, as the Supreme Court recently recognized, because corporate opportunity cases arise in widely varying factual contexts, "[h]ard and fast rules are not easily crafted to deal with such an array of complex situations." [43]

The peculiar facts of this case, involving a particularly striking "opportunity" for the corporation to benefit its stockholders, would seem to present a sufficiently substantial question of fiduciary misconduct to survive a motion to dismiss. Defendants advance several arguments, however, that they say require dismissal. First, defendants argue that because Kenetech did not have in place any policy or plan for repurchasing its stock, Kenetech had no cognizable expectancy in the Hillman offer. Next, defendants say that Section 160 of the DGCL, the contractual limitations in the Notes and the PRIDES Certificate of Designations barred Kenetech from repurchasing its own shares. Finally, defendants assert that the opportunity was presented to Lerdal in his individual capacity and not as a director. I take each argument in turn.

### 1. Kenetech's "Expectancy" in the Opportunity

■ First, defendants argue that the Hillman offer was not the type of opportunity that Delaware law requires be presented to the corporation. Defendants say that because Kenetech had no share repurchase program in effect, Hillman's offer did not constitute an opportunity in the company's line of business. Defendants cite to *Equity Corp. v. Milton,*[44] which can be read to stand for the proposition that a corporation may have no expectancy in receiving an opportunity to buy a block of its own stock *at market prices*. Unsurprisingly, neither that case nor any other holds that a Delaware corporation has no expectancy in being presented with an opportunity to repurchase a large block of its own stock for little or no consideration (thus providing nearly cost-free returns to its stockholders). And I need no authority to conclude otherwise.

The question, then, is whether plaintiffs allege that Kenetech could have taken advantage of that opportunity.

### 2. Section 160

■ A Delaware corporation may not repurchase its own shares "when the capital of the corporation is impaired or when such purchase or redemption would cause impairment of the capital of the corporation." [45] A surplus exists (meaning that the capital is not impaired) when the net assets of a corporation exceed its total liabilities.[46] Defendants argue that Kenetech's capital was impaired in the amount of $131,710,000. Thus, Kenetech could not purchase Hillman's shares even if it wanted to do so.

At first blush, this is a substantial impediment to Kenetech's ability to take advantage of the opportunity presented. Nevertheless, the well-pleaded allegations of the complaint, taken as true, show that

---

42. *Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 511 (1939).

43. *Broz v. Cellular Information Systems, Inc.,* Del.Supr., 673 A.2d 148, 155 (1996).

44. Del.Supr., 221 A.2d 494 (1966).

45. 8 *Del. C.* § 160(a)(1).

46. § 154.

this balance sheet capital account deficit would not have prevented Kenetech from acting. This is so because the Eco–Electrica project was being carried at a low book value and, it is alleged, Christenson and the rest of the board believed that its actual worth could exceed $200 million. Further, on December 15, 1997, Kenetech obtained financing for the project, thus making more likely an ultimate realization of a substantial sale price for the asset.

The complaint alleges that if the board revalued its assets to reflect the market value of Eco–Electrica, it could have eliminated the capital deficit and, thus, avoided the obstacle to a repurchase presented by Section 160(a). Certainly, a corporation may "revalue properly its assets and liabilities to show a surplus and thus conform to the statute." [47] For these reasons, neither Lerdal nor the other defendants can claim at this stage that Section 160 *really* represented a barrier to a *$1,000* stock repurchase by Kenetech.

### 3. The Senior Notes Restriction

█ Because of its default in payment on the Senior Notes, Kenetech was contractually restricted from repurchasing its own shares for value. Defendants argue that this contractual provision barred Kenetech from taking advantage of the Hillman offer. Yet, the Senior Notes holders had already waived their rights in allowing bonus payments *in excess of $1 million* to Kenetech's officers. Thus, the complaint alleges, there was reason to believe that the holders of the Senior Notes would not have objected to Kenetech's paying *$1,000* to repurchase the Hillman block of common stock. Additionally, the restrictions found in the Senior Notes Indenture are not necessarily as forbidding as defendants suggest. For example, Kenetech *could* complete "any purchase or redemption ... made by exchange for, or out of the substantially concurrent sale of, Capital Stock of the Company." [48] At least at this stage of the proceeding, it is fair to infer that some means of effectuating the transaction without violating the Senior Notes Indenture could have been arranged by a properly motivated and counseled board of directors.

I recognize that in *Broz,* the Supreme Court held on post-trial appeal that the corporation could not take the opportunity presented, in part because certain note restrictions "severely limited the discretion of CIS as to the acquisition of new assets and substantially restricted the ability of CIS to incur new debt." [49] That may, ultimately, prove to be the case here too. But in the context of this motion to dismiss, I draw a contrary inference based on the well-pleaded allegations of the complaint and the terms of the Indenture.[50]

### 4. The PRIDES Certificate

█ Since Kenetech was in arrears in paying dividends on the PRIDES, Kenetech was prohibited by Section 2(c) of the PRIDES Certificate of Designations from repurchasing its own shares. Pertinently, this provides that "no shares of any Junior Stock may be purchased, redeemed, or otherwise acquired by the Corporation or any of its subsidiaries (except in connection with a reclassification or exchange of

**47.** *Klang v. Smith's Food & Drug Centers, Inc.,* Del.Supr., 702 A.2d 150, 154 (1997).

**48.** Bracegirdle Aff., Ex. A § 10.09, ¶ 2.

**49.** Del.Supr., 673 A.2d at 155.

**50.** Because I reach this conclusion, I find it unnecessary to address plaintiffs' argument that the directors' fiduciary duties might have required them to authorize a breach of either the indenture or the PRIDES certificate of designation as a matter of economic efficiency.

any Junior Stock through the issuance of other Junior Stock ...)" whenever full dividends on the PRIDES have not been paid.

Of course, reliance on this provision to require dismissal of plaintiffs' claim requires a certain ironic sensibility. The restriction against common share repurchases was undoubtedly included in the PRIDES certificate to protect the holders of those "senior" securities against depredation by the "junior", i.e., common, stockholders. Yet, based on the well-pleaded allegations of the complaint, I must conclude at this stage of the proceedings that the PRIDES holders were substantially harmed by Kenetech's failure to purchase the Hillman block of shares. This is so because the PRIDES were facing mandatory conversion into common shares on May 14, 1998. Had the repurchase and retirement of the Hillman block reduced the amount of outstanding common, the PRIDES holders would have received in the mandatory conversion a substantially greater percentage of the common equity.

As with the Senior Notes Indenture, I am unable, at this stage of the case, to conclude with assurance that the PRIDES Certificate of Designation presented such an obstacle to Kenetech's repurchase of the Hillman block as to require dismissal. In this regard, I rely in part on the fact that the PRIDES Certificate is a part of the corporation's Certificate of Incorporation and is subject to amendment in accordance with Section 242 of the DGCL. Defendants are correct that a repurchase in violation of the Certificate would constitute an *ultra vires* act. However, as plaintiffs point out, Kenetech could have tried to get an amendment of the Certificate between October and December 1997. Alternatively, had the board actually considered its options and obtained advice, skilled counsel might have suggested some other mechanism to avoid the problems posed by the Certificate. Put simply, the Certificate does not present such a clear barrier to taking the opportunity as to require dismissal of the complaint. Rather, plaintiffs must be given the opportunity to prove their allegation.

### 5. The Capacity in which Lerdal Received the Offer

■ The complaint does not expressly allege that Lerdal became aware of the opportunity to purchase the Hillman block in his capacity as a President and CEO of Kenetech. Nevertheless, considering all of the relevant well-pleaded allegations of the complaint, it is fair to draw such an inference. For example, paragraph 12 alleges that "[o]n or about October of 1997, Lerdal was advised that a stockholder of Kenetech, Hillman Company, was shopping the [block] and was going to sell [it] in 1997." The same paragraph goes on to allege that "the other individual Defendants were also advised that the [block] was for sale and considered jointly purchasing it."

When questioned at oral argument, defendants' counsel properly conceded that in the circumstances, it is reasonable to infer that the offer was made to Lerdal *specifically because* he was the President and CEO of the Company. Thus, I will not consider this argument further.

\* \* \*

For the reasons stated above, plaintiffs adequately allege against Lerdal a claim for improper usurpation of a corporate opportunity. For the same reasons, I conclude that it states a claim for relief against the other defendants who knowingly acquiesced in Lerdal's alleged usurpation and failed to takes steps to protect Kenetech's interest in purchasing the shares itself.

## V. CONCLUSION

In summary, plaintiffs have established that demand under Court of Chancery Rule 23.1 is excused because they have shown that half of the present Kenetech board is unable to impartially consider any such demand. Further, I conclude that the complaint states a claim upon which relief may be granted against each person named as a defendant. Accordingly, I have today entered an order denying the motion to dismiss in all respects. Counsel are directed to confer and to report to the Court within thirty (30) days on a schedule for the disposition of this matter.