# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CHAILE STEINBERG, Derivatively for the Benefit of and on Behalf of Nominal Defendant HORTONWORKS, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2017-0286-AGB |
| ROBERT G. BEARDEN, PAUL CORMIER, PETER FENTON, MARTIN FINK, KEVIN KLAUSMEYER, JAY ROSSITER, MICHELANGELO VOLPI, and SCOTT J. DAVIDSON, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| HORTONWORKS, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: March 27, 2018
Date Decided: May 30, 2018

Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, and Jeremy J. Riley of RIGRODSKY & LONG, P.A., Wilmington, Delaware; *Counsel for Plaintiff*.

Elena C. Norman of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Jordan Eth, Anna Erickson White, and Ryan Keats of Morrison & Foerster LLP, San Francisco, California; *Counsel for Defendants Robert G. Bearden, Paul Cormier, Peter Fenton, Martin Fink, Kevin Klausmeyer, Jay Rossiter, Michelangelo Volpi, Scott J. Davidson, and Nominal Defendant Hortonworks, Inc.*

**BOUCHARD, C.**

In this action, a stockholder of Hortonworks, Inc. alleges that its board of directors and two of its officers breached their fiduciary duties by making or permitting to be made several materially false and misleading statements about the Company's financial condition. Specifically, the stockholder alleges that defendants knowingly misled the market on four occasions in the latter half of 2015 by stating that Hortonworks did not need a capital infusion, when the Company allegedly was in need of cash and the board privately was considering raising additional funds in a secondary public offering.

The complaint asserts three interrelated derivative claims, which defendants have moved to dismiss under Court of Chancery Rules 23.1 and 12(b)(6) for failure to make a pre-suit demand on the board of directors and for failure to state a claim for relief. For the reasons explained below, the motion will be granted because the complaint fails to allege particularized facts to excuse plaintiff's failure to make a demand.

## I.    BACKGROUND

The facts recited herein are taken from the Verified Shareholder Derivative Complaint filed on April 13, 2017 (the "Complaint"),[1] and documents incorporated therein, including documents produced to plaintiff in response to a request for books

---

[1] Dkt. 1.

and records under 8 *Del. C.* § 220.[2]  Any additional facts are either not subject to reasonable dispute or subject to judicial notice.

### A. The Parties

Nominal defendant Hortonworks, Inc. ("Hortonworks" or the "Company") is a publicly traded corporation that "creates, distributes and supports a new class of enterprise data management software solutions built on open source technology."[3] Plaintiff Chaile Steinberg alleges she has been a Hortonworks stockholder continuously since December 2014, which covers the period relevant to this case between August 13, 2015 and January 15, 2016.

The Complaint names eight individuals as defendants.  They are all directors and/or officers of Hortonworks.  Defendant Robert G. Bearden co-founded the Company, serves as its CEO, and is one of seven members who served on Hortonworks's board of directors (the "Board") during the relevant period and when this action was filed.  The other six directors on the Board are defendants Paul Cormier, Peter Fenton, Martin Fink, Kevin Klausmeyer, Jay Rossiter, and Michelangelo Volpi (the "Director Defendants").  Klausmeyer, Fenton, and Volpi

---

[2] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citation omitted) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[3] Compl. ¶ 17.

served on the Board's Audit Committee during the relevant period. The eighth named defendant is Scott J. Davidson, Hortonworks's CFO.

## B.	Alleged False and Misleading Statement #1

On August 13, 2015, Hortonworks filed its Form 10-Q for the period ended June 30, 2015 (the "Second Quarter 10-Q").[4] Addressing the Company's future liquidity expectations, the Second Quarter 10-Q stated: "We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements for at least the next 12 months."[5] Steinberg contends that this statement "was materially false and misleading because it omitted the fact that the Board approved" a secondary public offering "on August 20, 2015, exactly one week later, and was undoubtedly considering it at the time of the statement."[6]

Bearden and Davidson, as the Company's CEO and CFO, each signed a certification for the Second Quarter 10-Q pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"). In their SOX certifications, Bearden and

---

[4] Compl. ¶ 45.

[5] Compl. ¶ 45 (emphasis omitted).

[6] Pl.'s Answering Br. 24-25 (Dkt. 18).

Davidson each attested, among other things, that they had reviewed the Second Quarter 10-Q and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."[7]

### C.    The Board Considers a Secondary Public Offering

On August 20, 2015, the Board held a regularly-scheduled meeting during which Davidson reviewed "the Company's recent financial results and key metrics."[8]  During this review, Davidson made a presentation concerning a potential $130 million secondary public offering, with 95% of the shares to be offered by Hortonworks.[9]  Davidson's presentation listed four reasons to complete the offering at that time:

- Competitive dynamics (get ahead of potential IPOs from Cloudera and MapR)

- Increase liquidity and float as larger investors want more of both

- Alleviate investor concerns of our need to have more cash on the balance sheet

---

[7] Compl. ¶ 46.

[8] Compl. ¶ 41.

[9] Transmittal Affidavit of Nicholas J. Rohrer ("Rohrer Aff.") Ex. D at H_S_14-20 (Dkt. 12).  The slide deck for the August 20, 2015 Board meeting, which was produced to Steinberg in response to her Section 220 demand, is quoted in part and cited in its entirety in paragraph 43 of the Complaint.

- CFO rulebook #1: "always take the $ when you don't need it[10]

At its August 20 meeting, the Board unanimously adopted resolutions authorizing the Company to continue undertaking preparations for a secondary public offering. The Board also appointed a pricing committee, consisting of defendants Bearden, Fenton, and Klausmeyer, to negotiate with underwriters.[11] Despite these preparations, Hortonworks did not pursue further a secondary public offering at the time.

### D.     Alleged False and Misleading Statement #2

On November 4, 2015, Hortonworks held an earnings call after releasing its third quarter financial results that day.[12] The following exchange occurred during the call:

> Q: I think you gave the headcount number at about 800. Obviously, it's good growth year-over-year. I know there was some acquisition in there. But when you think about just sort of feeding the beast of sales and marketing here, because you do keep acquiring more new customers but also the deal sizes to existing customers are getting bigger, I mean how should we think about how you are ramping that sales force? And then also kind of relative to some of those partnerships in the channel, et cetera that you also have?
>
> BEARDEN: Yes. So it is about actually overall enabling the model. There will be always organic adding of direct field reps, in addition to that though we are very focused on the ecosystem and creating [pull ph] markets with our partners. And we are actually seeing that part of our

---

[10] Rohrer Aff. Ex. D at H_S_15.

[11] Compl. ¶ 42.

[12] Compl. ¶¶ 49, 52.

business begin to gain real traction *and seeing actual pull through revenue, that's meaningful, come through*. And that gives us leverage of course. The other thing that we are able to do now is also get incremental leverage from our existing sales organization with the new product that we just obviously outlined on this call and which is the Hortonworks DataFlow platform. And so now we can as a multi product company get more leverage per rep with incremental product. And so we are going to see the benefit of that going forward as well.[13]

Steinberg asserts that Bearden's statement on this call "was false and misleading because he '*knew* the Company needed more cash than it was generating going forward, hence the resolution approving the secondary offering, and that the additional sources of revenue [he] cited . . . would be insufficient to meet the Company's needs.'"[14]

## E. Alleged False and Misleading Statement #3

On November 12, 2015, Hortonworks filed its Form 10-Q for the period ended September 30, 2015 (the "Third Quarter 10-Q") in which it included the same statement about the Company's future liquidity expectations as it did in the Second Quarter 10-Q, *i.e.*, "We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements for at least the next 12 months."[15] Bearden and

---

[13] Compl. ¶¶ 52-53 (emphasis in original).

[14] Pl.'s Answering Br. 25-26 (citing Compl. ¶ 54 and emphasis in original).

[15] Compl. ¶ 66 (emphasis omitted).

Davidson signed SOX certifications for the Third Quarter 10-Q, as they did for the Second Quarter 10-Q.[16] The Audit Committee "reviewed and discussed with Management the Third Quarter 2015 financial statements and Form 10-Q" and resolved that "the Company shall include the Company's Third Quarter 2015 financial statements in the Company's Quarterly Report on Form 10-Q to be submitted to and filed with the SEC."[17]

Steinberg contends that the statement (quoted above) about the Company's future liquidity expectations "was materially false and misleading in that it omitted the fact the Board approved the [secondary public offering] on August 20, 2015 because the Company needed more cash."[18]

## F.    Alleged False and Misleading Statement #4

On December 1, 2015, Bearden and Brian Marshall, Hortonworks's Vice President of Corporate Development, attended the Credit Suisse Technology, Media, and Telecom Conference.[19] During the Company's session, questions were asked about Hortonworks's cash position:

> Q:  You said the B word so I'm going to ask a question, burn. So cash burn because obviously I've been getting that question, you know, last night, this morning. You know, when you guys look at your sort of cash position, and you're obviously in this point of your lifecycle where

---

[16] Compl. ¶ 67.

[17] Compl. ¶¶ 20, 22, 24, 68; Pls.' Answering Br. Ex. 2 ¶ 2.

[18] Pl.'s Answering Br. 26; Tr. 22 (Mar. 27, 2018) (Dkt. 29).

[19] Compl. ¶¶ 70, 74.

7

you're growing fast, you're hiring people, big market opportunity you just talked about, and then big market opportunity hitting inflection point. You know, how do you sort of balance the need to invest, but also looking at your burn and at the, you know just the cash on the balance sheet? So kind of a question for both of you, like how do you think about that because—yeah, I'll just leave it there.

BEARDEN: Well, we have a model that today shows us getting the cash (inaudible) profitability in early 2017. Even with the two acquisitions that we've done, we're very comfortable with that model. In fact we're showing improved performance against that, that Brian [Marshall] just pointed out in Q3, quarter-over-quarter. And with that *we have roughly $116 million in cash. It gives us a fully funded model to that point of profitability when you do, you know, when you extrapolate your model, we're somewhere under $50 million in cash. We're comfortable operating on that*.

Q: That was my next question.

BEARDEN: Yeah. *We're comfortable operating on that. At some point* we may choose to take an opportunistic view downstream into the markets, *but we'll do that on an opportunistic basis when the time is right*.

Q: Got it. Okay, so, because that's the question, like I've given you this example before, you know plane taking off the aircraft carrier, you don't mind getting close to the water, just don't crash into it, you know. So there's enough air, so to speak, between you and the water you feel comfortable with? Okay.

BEARDEN: *Very much so*. And we see the market continuing to expand, and you know *we're very comfortable with our positioning and where we are from an execution against our model*.[20]

---

[20] Compl. ¶ 74 (emphasis in original).

8

Steinberg contends that "[d]efendant Bearden's statements at the Credit Suisse Conference that the Company was comfortable operating on its cash model, even if its cash balance dipped below $50 million, and that it 'may choose' to look for . . . additional cash in the markets were false and misleading because, unknown to investors, the Board had already approved the secondary public offering and Bearden knew the Company needed additional cash."[21]

## G.     Hortonworks Launches a Secondary Public Offering

On January 13, 2016, the Board unanimously adopted resolutions authorizing the Company to prepare for a new secondary public offering and appointed a pricing committee consisting of Bearden, Fenton, and Volpi.[22]  This pricing committee was different from the one that previously had been appointed on August 20, 2015, which consisted of Bearden, Fenton, and Klausmeyer.

On January 15, 2016, Hortonworks filed a Form S-3 and issued a press release announcing that it would be conducting a secondary public offering.[23]  The Form S-3 stated "[t]he principal purposes of this offering are to raise additional capital to increase our financial flexibility.  We intend to use the net proceeds that we receive

---

[21] Pl.'s Answering Br. 27.

[22] Compl. ¶ 84 n.5.

[23] Compl. ¶¶ 79-80.

from this offering for working capital or other general corporate purposes, including funding our growth strategies discussed in this prospectus."[24]

On January 19, 2016, the first trading day after the announcement of the secondary public offering, the Company's stock closed down 37 percent, falling from $16.57 per share to $10.44 per share.[25] The next day, on January 20, the Board convened a special meeting to review the "market reaction to the Company's filing of a Registration Statement on Form S-3 on January 15, 2016."[26] During the meeting, the Board:

> discussed possible timelines for completing an equity offering in a registered transaction and alternative methods for the Company to raise additional financing, including possible timelines and terms for doing so. Alternatives discussed included, but were not limited to, the follow-on equity offering (as planned or adjusted), private investments, and debt financing options. The Board agreed to continue discussions regarding the various financing options and to discuss such alternatives with the Company's advisors.[27]

On January 25, 2016, the Board appointed a Special Committee "to explore one or more potential financing transactions."[28] The Special Committee held a series of meetings to address the benefits and risks of the various options, consulted with

---

[24] Compl. ¶ 80.

[25] Compl. ¶ 83.

[26] Compl. ¶ 84 (internal quotations omitted).

[27] Compl. ¶ 84.

[28] Compl. ¶ 85 (internal quotations omitted).

advisors, and ultimately resolved on January 26, 2016 to raise up to $100 million through the secondary public offering announced on January 15.[29]  On February 1, 2016, the pricing committee approved the sale of shares in the offering at a price of $9.50 per share.[30]

### H.    The Securities Class Action

On February 29, 2016, a federal securities class action was filed in the Northern District of California, captioned *Monachelli v. Hortonworks, Inc. et al.*, Case No. 3:16-cv-980-SI (N.D. Cal.).  The First Consolidated Amended Complaint in *Monachelli* asserted securities fraud claims against Hortonworks, Bearden, and Davidson.[31]  The six non-management directors on the Board were not named as defendants.

The First Consolidated Amended Complaint alleged that between August 5, 2015 and January 15, 2016, Hortonworks, Bearden, and Davidson "provided a steady stream of false and misleading statements as to the strength of Hortonworks' cash holdings, its revenues and cash being derived from sales to customers, and its ability to meet capital needs from these sources of cash."[32]  Plaintiffs in *Monachelli* did not plead, and the court did not consider, the Board's August 20, 2015 approval

---

[29] Compl. ¶¶ 85-88.

[30] Compl. ¶ 89.

[31] Compl. ¶ 11.

[32] Compl. ¶ 11; Rohrer Aff. Ex. L ¶ 8.

of a secondary public offering as indicative of the purported falsity of the statements in question.[33]

On December 5, 2016, the district court granted defendants' motion to dismiss but with leave to amend.[34] The court found that allegations about "the Company's state of rapid growth and increased expenses . . . do not adequately establish that any of the statements made by defendants during the Class Period were false."[35] Plaintiffs in the *Monachelli* action later agreed to settle the case on behalf of the class for $1.1 million.[36] The court approved the settlement on October 10, 2017.[37]

## II. PROCEDURAL HISTORY

On April 13, 2017, Steinberg filed the Complaint, asserting three claims derivatively on behalf of Hortonworks. Count I asserts that defendants breached their fiduciary duties "by making, allowing, or failing to correct the materially false and misleading misrepresentations and omissions alleged herein."[38] Count II "seeks relief from defendants on the theory of contribution and indemnity to the extent that the Company is liable for allegations that the Individual Defendants violated their

---

[33] Compl. ¶ 91.

[34] Compl. ¶ 91; Rohrer Aff. Ex. M.

[35] Rohrer Aff. Ex. M at 16.

[36] Compl. ¶ 12.

[37] Pl.'s Answering Br. Ex. 4.

[38] Compl. ¶ 112.

fiduciary duties in connection with false statements about the Company's cash requirements, including but not limited to the liability agreed upon in the settlement of the *Monachelli* Action."[39]  Count III is a claim for unjust enrichment that seeks restitution from defendants and "an order from this Court disgorging all profits, including any performance-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties."[40]

On July 3, 2017, defendants moved to dismiss this action under Court of Chancery Rules 23.1 and 12(b)(6) for failure to make a pre-suit demand on the Board and for failure to state a claim upon which relief may be granted.[41]  The court heard argument on the motion on March 27, 2018.

## III.    ANALYSIS

I first consider defendants' motion to dismiss under Rule 23.1 for failure to make a demand on the Board.  For the reasons explained below, I find that demand is not excused and thus defendants' motion to dismiss must be granted.  Based on this conclusion, it is not necessary to address defendants' motion to dismiss under Rule 12(b)(6) for failure to state a claim.

---

[39] Compl. ¶ 121.

[40] Compl. ¶ 126.

[41] Dkt. 4.

13

## A. Legal Standard Governing Demand Futility

"The decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors."[42] Accordingly, stockholders may not prosecute a claim derivatively on behalf of a corporation unless they either "(1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile."[43] Making a pre-suit demand is futile when the directors upon whom demand would be made "are incapable of making an impartial decision regarding such litigation."[44]

Because Steinberg did not make a demand on the Board before initiating this action, she must allege with particularity that her failure to do so should be excused.[45] In this analysis, the court accepts as true Steinberg's particularized allegations of fact and draws all reasonable inferences that logically flow from those allegations in her favor.[46]

---

[42] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing 8 *Del. C.* § 141(a)).

[43] *Id.*

[44] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[45] Ct. Ch. R. 23.1; *see* Compl. ¶¶ 99-108.

[46] *White v. Panic*, 783 A.2d 543, 549 (Del. 2001).

Under Delaware law, depending on the factual scenario, there are two tests for determining whether demand may be excused: the *Aronson* test and the *Rales* test.[47] The test articulated in *Aronson v. Lewis*[48] applies when "a *decision* of the board of directors is being challenged in the derivative suit."[49] The test set forth in *Rales v. Blasband*, on the other hand, governs when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit," such as instances "where directors are sued derivatively because they have failed to do something."[50]

"A decision approved by at least half of the corporation's directors who would consider a demand, even when acting by committee, can be imputed to the entire board and thus triggers the *Aronson* test . . . By contrast, the *Rales* test applies where a derivative plaintiff challenges a decision approved by a board committee consisting of less than half of the directors who would have considered a demand, had one been made."[51] Under either test, plaintiff "must impugn the ability of at

---

[47] This court has noted in the past that, although "the *Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry[,] . . . that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*." *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) (Strine, V.C.).

[48] 473 A.2d 805 (Del. 1984).

[49] *Rales*, 634 A.2d at 933 (emphasis in original).

[50] *Id*. at 933-34 & n.9.

[51] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 56-57 (Del. Ch. 2015) (citations omitted).

15

least half the directors in office when it initiated [its] action . . . to have considered a demand impartially."[52]

## B. Demand Futility is Governed by *Rales*

Consistent with the principle that a demand futility analysis "is conducted on a claim-by-claim basis" under Delaware law, the court must look at each of the four purportedly false and misleading statements separately to determine whether the *Aronson* or *Rales* test applies to them.[53] In my opinion, the *Rales* test governs Steinberg's challenge concerning each of these statements.[54]

The statements made by Bearden during an earnings call and at an industry conference (Statements #2 and #4) are actions taken by one person and plainly were not decisions approved by a majority of the Board. Steinberg makes no argument to the contrary.[55] Accordingly, the *Rales* test applies to Steinberg's claim concerning those two statements.

---

[52] *Id*. at 57 (citation omitted).

[53] *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014) (citing *Beam ex rel. Martha Stewart Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) *aff'd*, 845 A.2d 1040 (Del. 2004)).

[54] Ultimately it is inconsequential which test applies, because under both *Rales* and *Aronson*, the relevant inquiry is whether Steinberg has pled sufficiently a non-exculpated claim for bad faith against a majority of the Board. *See In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007) (noting that both tests boil down to whether "the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith").

[55] *See* Pl.'s Answering Br. 25-27.

With respect to the representations about future liquidity expectations in the Second and Third Quarter 10-Qs (Statements #1 and #3), Steinberg argues that the *Aronson* test should apply on the theory that four of the seven directors on the Board (Bearden and the three members of the Audit Committee) either made or approved the statements. For example, with respect to Statement #3, Steinberg argues:

> Plaintiff alleged Chairman and CEO Bearden "knowingly, intentionally . . . made false and misleading statements." Plaintiff also alleged Audit Committee members Fenton, Klausmeyer, and Volpi unanimously approved the false and misleading financial statements in the Company's [Third Quarter 10-Q], and Bearden executed the SOX certifications for the filing. These are direct actions taken by a majority of the members of the Board in violation of their fiduciary duties.[56]

Similarly, with respect to Statement #1, Steinberg contends that "Bearden signed the SOX certifications for the [Second Quarter 10-Q and] it is reasonable to infer the three Audit Committee members approved the language in the [Second Quarter 10-Q], because (1) it was their responsibility to do so; and (2) the Audit Committee unanimously approved similar language in the [Third Quarter 10-Q]."[57]

These contentions fail to establish the existence of a singular "decision" that was made by at least half of the Board to trigger *Aronson* for two independent reasons. *First*, Bearden's decisions to sign SOX certifications for the Second and Third Quarter 10-Qs constituted different decisions from the ones the Audit

---

[56] Pl.'s Answering Br. 20 (citing Compl. ¶¶ 67-68, 105, 111).

[57] *Id*. at 25 (citing Compl. ¶¶ 32, 68; Rohrer Aff. Ex. G).

17

Committee made to approve the financial statements to be included in those reports. Put differently, Steinberg is attempting, improperly in my view, to aggregate two separate and distinct actions that Bearden, on the one hand, and the three members of the Audit Committee, on the other hand, took in order to try to attain the Board majority threshold to trigger *Aronson*. No authority has been cited to support applying *Aronson* in this cumulative manner.

*Second*, this court has held in similar circumstances that the issuance of false or misleading statements in public filings, including disclosures concerning accounting practices, does not constitute "a business decision of the Board but rather a violation of the Board's oversight duties" and thus is governed by *Rales* for purposes of a demand futility analysis.[58] Here, the Audit Committee did not make any affirmative statements, misleading or otherwise, regarding the Company's liquidity. Rather, the Audit Committee only approved the financial statements for

---

[58] *See, e.g.*, *Sandys v. Pincus*, 2016 WL 769999, at *14-15 (Del. Ch. Feb. 16, 2016), *rev'd on other grounds*, 152 A.3d 124 (Del. 2016) (citing *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) and *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *6 n.25 (Del. Ch. Jan. 11, 2010)) (characterizing a claim that director defendants "failed to ensure that [the company] maintained adequate controls regarding its public disclosures and failed to disclose material information to the public" as "essentially a *Caremark* claim" and applying the *Rales* test); *In re China Auto. Sys. Inc. Derivative Litig.*, 2013 WL 4672059, at *1, 7 (Del. Ch. Aug. 30, 2013) (applying the *Rales* test where an Audit Committee purportedly "failed to monitor adequately the Company's accounting practices" which led to the company's "issuance of false and misleading statements.").

inclusion in the Second and Third Quarter 10-Qs that allegedly omitted material information in other sections of those quarterly reports.

### C.    Steinberg's Failure to Make a Demand is Not Excused

Under *Rales*, Steinberg's claims must be dismissed under Rule 23.1 unless the particularized allegations of the Complaint "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[59] When the Complaint was filed in this action, the Board consisted of the seven Director Defendants.  Thus, in order to establish that demand is excused, the particularized allegations of the Complaint must create a reasonable doubt as to the independence or disinterestedness of four of those individuals.

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."[60] Accordingly, a director can be rendered "interested" with respect to whether

---

[59] 634 A.2d at 934.

[60] *Id.* at 936 (citations omitted).

19

litigation should be brought when the director would face a "substantial threat" of personal liability.[61]

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[62] "A director lacks independence for purposes of determining demand futility when he or she is sufficiently beholden to someone interested in the litigation that he or she may be unable to consider the demand impartially."[63]

Steinberg does not argue that any of the Director Defendants received a personal benefit in connection with any of the claims at issue in this case. No allegations are made, for example, that any of the Director Defendants benefitted from selling stock in connection with any of the challenged disclosures. Nor does Steinberg argue that any of the Director Defendants lacked independence with respect to the challenged statements. Rather, Steinberg's sole basis for contending that demand is excused is her contention that a majority of the Board faces a substantial threat of personal liability with respect to her disclosure claims such that the Board could not consider a demand impartially.[64]

---

[61] *Kohls v. Duthie*, 791 A.2d 772, 782 (Del. Ch. 2000).

[62] *Aronson*, 473 A.2d at 816.

[63] *Sandys*, 2016 WL 769999, at *7 (citing *Beam*, 845 A.2d at 1050).

[64] Tr. 25-26 (Mar. 27, 2018).

Hortonworks's certificate of incorporation contains an exculpatory provision adopted under 8 *Del. C.* § 102(b)(7).[65] Thus, as Steinberg acknowledges, she "must establish a breach of the duty of loyalty, i.e., bad faith, by a majority of the Board."[66] As this court has held on numerous occasions, "to state a bad-faith claim, a plaintiff must show either [1] an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or [2] that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[67]

Turning to the specific disclosures at issue, the court in *In re Citigroup Inc. Shareholder Derivative Litigation* faced an analogous factual scenario.[68] There, plaintiffs alleged that the director defendants violated their duty of disclosure by not disclosing adequately certain risks that the company faced.[69] Former Chancellor Chandler began his analysis of this derivative claim by explaining what the duty of disclosure requires:

> Even in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with

---

[65] Rohrer Aff. Ex. A at Art. VII.

[66] Pl.'s Answering Br. 27-28.

[67] *In re Meadwestvaco Stockholders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) (quoting *In re Chelsea Therapeutics Int'l Ltd. Stockholders Litig.*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016) (internal quotations omitted)).

[68] 964 A.2d 106.

[69] *Id.* at 131-32.

21

complete candor and in good faith. When there is no request for shareholder action, a shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors *deliberately* misinformed shareholders about the business of the corporation, either directly or by a public statement.[70]

Applying this standard, the Chancellor found that the pleadings in *Citigroup* failed to demonstrate that the director defendants faced a substantial likelihood of liability for essentially three reasons, two of which are relevant here.[71] Specifically, he found that plaintiffs failed to plead "specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow [him] to reasonably conclude that the director defendants face a substantial likelihood of personal liability."[72] The Chancellor also found that plaintiffs did "not sufficiently allege that the director defendants had knowledge that any disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not adequately informing themselves."[73] As discussed below, these two reasons apply with equal force here, leading me to conclude that a majority of the Director Defendants does not face a substantial threat of personal liability for violating the duty of disclosure.

---

[70] *Id*. at 132 (citations, internal quotations, and alterations omitted).

[71] *Id*. at 132-34. The third reason, which is not applicable here, was that plaintiffs had failed "to allege with sufficient specificity the actual misstatements or omissions that constituted a violation of the board's duty of disclosure." *Id.* at 132-33 (citation omitted).

[72] *Id*. at 134 (citation omitted).

[73] *Id*. (citation omitted).

### 1. Statements #2 and #4

According to the Complaint, Bearden is the person who made the challenged statements during the November 4, 2015 earnings call and at the industry conference held on December 1, 2015 (*i.e.*, Statements #2 and #4). Critically, the Complaint fails to allege facts suggesting that any of the other six directors on the Board were present at these events or had any personal involvement in making any of these statements.[74] The Complaint also is devoid of any particularized factual allegations that any of these six directors had knowledge that any of the specific statements Bearden made during the earnings call or at the industry conference were false or misleading. For these two reasons, a majority of the Board clearly does not face a substantial threat of personal liability with respect to Statements #2 and #4.

### 2. Statements #1 and #3

Statements #1 and #3 consist of an identical disclosure in the Second and Third Quarter 10-Qs concerning the Company's liquidity expectations for the next twelve months: "We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and

---

[74] *See id.* ("Plaintiffs do not allege facts suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions.").

23

professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements for at least the next 12 months."[75]

Steinberg contends that her strongest claim concerns the disclosure in the Third Quarter 10-Q (Statement #3) because it was made *after* the August 20, 2015 meeting during which the Board authorized the Company to continue undertaking preparations for a secondary public offering after hearing a presentation on the subject.[76] According to Steinberg, four of the seven directors on the Board face a substantial threat of personal liability for acting in bad faith with respect to that disclosure because (i) Bearden signed a SOX certification for the Third Quarter 10-Q and (ii) the three members of the Audit Committee (Fenton, Klausmeyer, and Volpi) approved Hortonworks's financial statements for inclusion in the Third Quarter 10-Q, despite knowing that "the Board had approved the [secondary public offering] and could announce it at any time."[77]

Steinberg's argument fails in my opinion for two reasons. *First*, putting aside Bearden, who is differently situated from all of the other directors because he signed

---

[75] Compl. ¶¶ 45, 66.

[76] Tr. 32, 45-46 (Mar. 27, 2018). The disclosure of Statement #1 in the Second Quarter 10-Q was made one week *before* the August 20 Board presentation that is the lynchpin of Steinberg's case and thus, as Steinberg tacitly concedes, that presentation has limited probative value concerning the directors' state of mind at an earlier point in time.

[77] Pl.'s Answering Br. 26. Steinberg does not contend that the three remaining directors (Cormier, Fink, or Rossiter) acted in bad faith with respect to any of the challenged statements, including the ones in the Second and Third Quarter 10-Qs.

24

a SOX certification for the Third Quarter 10-Q, the problem with this argument is that merely pleading that the Audit Committee "'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1"[78] Absent from the Complaint is any particularized allegation that the members of the Audit Committee played any specific role concerning the inclusion of Statement #3 in the Third Quarter 10-Q. As the court explained in *Citigroup*, these are the types of "factual details that are crucial to determining whether demand on the board of directors would have been excused as futile,"[79] but they are missing here.

*Second*, and more fundamentally, the Complaint fails to plead facts demonstrating that the members of the Audit Committee acted with the requisite scienter to support a claim for bad faith.[80] Steinberg argues that the Audit Committee

---

[78] *Citigroup*, 964 A.2d at 133 n.88*; see also id.* at 135 ("Although the members of the ARM Committee were charged with reviewing and ensuring the accuracy of Citigroup's financial statements under the ARM Committee charter, director liability is not measured by the aspirational standard established by the internal documents detailing a company's oversight system. Under our law, to establish liability for misstatements when the board is not seeking shareholder action, shareholder plaintiffs must show that the misstatement was made knowingly or in bad faith."); *South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) ("As numerous Delaware decisions make clear, an allegation that the underlying cause of corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1.").

[79] 964 A.2d at 133 n.88

[80] *Wood*, 953 A.2d at 141 (citation omitted) (defining scienter as having "'actual or constructive knowledge' that [one's] conduct was legally improper").

25

members (and Bearden) "knew" Statement #3 was false because the entire Board "heard Davidson's presentation and approved the [secondary public offering]."[81] The critical deficiency in this argument is that Steinberg fails to point to anything in Davidson's August 20, 2015 presentation that, fairly read, could be said to demonstrate knowledge of falsity on the part of the Audit Committee members.

As her best evidence, Steinberg relies on the second and third reasons listed in the August 20 presentation explaining why the Company should launch the secondary public offering at that time:

- Increase liquidity and float as larger investors want more of both

- Alleviate investor concerns of our need to have more cash on the balance sheet[82]

The plain language of these bullet points, however, focuses on *stockholder desires or concerns* and *not on management's belief* about the Company's cash position or operational needs.

To be more specific, neither of these bullet points negates the truthfulness of management's stated belief several months later (*i.e.*, as of November 12, 2015) that Hortonworks's "existing cash and cash equivalents balance, together with cash generated from sales" would be sufficient to meet the Company's "working capital

---

[81] Pl.'s Answering Br. 30.

[82] Pl.'s Answering Br. 29 (emphasis omitted).

and capital expenditure requirements for at least the next 12 months." Rather, these points merely reference, in a generalized way, what "larger investors" want (*i.e.*, increased liquidity and float) and "investor concerns" about having "more cash on the balance sheet." These statements do not demonstrate that management actually believed as of November 12, 2015, contrary to Statement #3, that the Company's cash on hand and cash expected from sales would not be sufficient to meet the Company's working capital and capital expenditure requirements for the next twelve months or more. Indeed, the fourth and final reason cited in the August 20 presentation for undertaking the secondary public offering—"CFO rulebook #1: 'always take the $ when you don't need it'"—strongly implies that management did not believe it needed to raise cash at the time.[83]

In sum, Steinberg has failed to allege with particularity, as the law requires, facts sufficient to demonstrate that the members of the Audit Committee (or any of the other three outside directors) (i) were personally involved in including Statements #1 and #3 in the Second and Third Quarter 10-Qs or (ii) had reason to know that those statements were false so as to support a reasonable inference that they *intentionally* disregarded their fiduciary duties or otherwise acted in bad faith. As such, I have no reason to believe that at least six of the seven members of the

---

[83] Rohrer Aff. Ex. D at H_S_15.

Board—all outside directors whose independence and disinterestedness are otherwise conceded—face a substantial threat of personal liability so as to call into question the ability of a majority of the Board to consider a demand impartially with respect to those claims.

* * * * *

For the reasons explained above, demand is not excused for Steinberg's breach of fiduciary duty claim. Thus, Count I must be dismissed under Rule 23.1.

### D. Counts II and III are Derivative of Count I and Must be Dismissed

Steinberg's remaining claims, for indemnification and contribution (Count II) and unjust enrichment (Count III), are both contingent on her ability to adequately plead Count I.[84] Accordingly, because demand is not excused as to Count I, the same holds true for Counts II and III, which also must be dismissed under Rule 23.1.

## IV. CONCLUSION

For the reasons explained above, defendants' motion to dismiss is GRANTED.

**IT IS SO ORDERED.**

---

[84] *See Commonwealth Land Title Ins. Co. v. Funk*, 2015 WL 1870287, at *4 (Del. Super. Ct. Apr. 22, 2015) (dismissing under Rule 12(b)(6) indemnification and contribution claims where no underlying wrong or common liability was successfully pled); *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *7 n.73 (Del. Ch. Mar. 17, 2006) (granting motion to dismiss an unjust enrichment claim where complaint failed to allege how "individual defendants personally benefitted from the challenged transaction").

28