ROTHSCHILD INTERNATIONAL COR-
PORATION, a corporation of the
State of Washington, Plaintiff,

v.

LIGGETT GROUP INC., GM Sub Corpora-
tion and GM Sub II Corporation, corpo-
rations of the State of Delaware, and
Grand Metropolitan Limited, a corpora-
tion of England, Defendants.

Court of Chancery of Delaware,
New Castle County.

Submitted: April 18, 1983.
Decided: June 29, 1983.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, and Gerald J. Fields, of Battle, Fowler, Jaffin & Kheel, New York City, for plaintiff.

R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, and Gandolfo V. Di-Blasi, of Sullivan & Cromwell, New York City, for defendants.

BROWN, Chancellor.

This suit arises out of a combined tender offer and merger whereby GM Sub Corporation, an indirect, wholly-owned subsidiary of Grand Metropolitan Limited, a corporation of England, acquired all outstanding shares of the defendant Liggett Group, Inc., a Delaware corporation. GM Sub Corporation ("GM Sub") was formed as a Delaware corporation for the purpose of carrying out this acquisition. At the time of the tender offer and merger the plaintiff Rothschild International Corporation (hereafter "Rothschild") was the owner of 650 shares of the 7% Cumulative Preferred Stock of Liggett Group, Inc.

Rothschild has brought this suit as a purported class action on behalf of all former owners of the 7% Cumulative Preferred Stock (hereafter "the 7% Preferred"), including both those who voluntarily tendered their preferred shares in response to the tender offer as well as those who were subsequently cashed out under the terms of the merger. It is the position of Rothschild that under the applicable provisions of the restated certificate of incorporation of the Liggett Group, Inc. (hereafter "Liggett") all of the 7% Preferred shareholders were shortchanged $30 per share under the terms of both the tender offer and the merger. Rothschild charges that Liggett initially as well as Grand Metropolitan Limited* ("Grand Met") as the emerging majority shareholder of Liggett through GM Sub, breached a fiduciary duty owed to the 7% Preferred shareholders by not causing them to be paid the full contractual value of their preferred shares. Rothschild seeks the recovery of $30 per share on behalf of the class comprised of all former owners of the 7% Preferred.

Although there has been no decision as yet on the pending motion for class action certification, both sides have moved for summary judgment on the merits of Rothschild's contention. Since it appears that there is no dispute as to any material fact, the matter would seem to be in an appropriate posture for disposition by summary judgment. The relevant undisputed facts are as follows.

Liggett was incorporated originally in 1911 in New Jersey under the name of Liggett & Myers Tobacco Company. Among other things, its certificate of incorporation authorized the issuance of some 153,000 shares of the 7% Preferred stock. This preferred stock had a fixed par value of $100 per share. More importantly for the purposes of the present matter, it also carried with it a liquidation value of $100 per share. In addition, the 7% Preferred contained certain features which are said to be relatively uncommon in today's market. Specifically, it could not be redeemed; it was not convertible; and it was not subject to call. Moreover, it was senior to the other classes of Liggett stock in the event of a liquidation.

In time Liggett was reincorporated in Delaware. However, the original liquidation rights of the 7% Preferred stock were carried over and set forth as follows in Liggett's restated certificate of incorporation:

"In the event of any liquidation of the assets of the Corporation (whether voluntary or involuntary) the holders of the 7%

---

* The complaint against Grand Metropolitan Limited has been dismissed previously for lack of personal jurisdiction. Continued reference is nonetheless made to Grand Metropolitan Limited in this decision because of its parental relationship to GM Sub Corporation, which is a party defendant.

Preferred Stock shall be entitled to be paid the par amount [$100] of their 7% Preferred shares and the amount of any dividends accumulated and unpaid thereon before any amount shall be payable or paid to the holders of any other class or series of stock, and after payment to the holders of the 7% Preferred Stock of its par value and the dividends accrued and unpaid thereon, the residue of the assets of the Corporation shall be divided among and paid to the holders of the other classes or series of stock."

It is against this framework of Liggett's corporate charter that we have the acquisition of Liggett by Grand Met through GM Sub and the accompanying birth of Rothschild's class action contentions.

Grand Met, through GM Sub, commenced its tender offer for all of the equity securities of Liggett on April 18, 1980. The initial offer of GM Sub was $67.50 for each share of the 7% Preferred, $114.94 for each share of another series of Liggett preferred stock—the $5.25 Convertible Preferred— and $50 per share for each share of Liggett common stock. At the time of the tender offer the 7% Preferred was listed for trading on the New York Stock Exchange and traded in the range of $60–61 per share.

In its offer to purchase GM Sub fully disclosed that "in the event of voluntary or involuntary liquidation of [Liggett], the holders of the 7% Preferred Stock are entitled to receive $100 per share, plus any accumulated or unpaid dividends thereon, before any amounts shall be paid to holders of any other class or series of capital stock of [Liggett]."

On May 12, 1980, Standard Brands Incorporated entered the picture as a white knight on behalf of Liggett and commenced a competing tender offer. The offer of Standard Brands was at $70 per share for any and all shares of the 7% Preferred and $65 per share for up to 4 million shares of Liggett's common stock. The offer of Standard Brands was endorsed by the board of directors of Liggett as being fair to Liggett's shareholders.

Thereafter, on May 14, 1980, GM Sub increased its offer to the shareholders of Liggett to $70 per share for the 7% Preferred, to $158.62 for the $5.25 Convertible Preferred, and to $69 for each share of common stock. Standard Brands immediately withdrew its competing offer. Liggett's board of directors correspondingly approved the amended offer of GM Sub as being fair and recommended that it be accepted by Liggett's shareholders. As a result, 39.8% of the outstanding shares of the 7% Preferred was tendered and sold to GM Sub. In addition, GM Sub acquired 87.4% of Liggett's outstanding common stock and 75.9% of the $5.25 Convertible Preferred.

Under the terms of Liggett's charter, the 7% Preferred had no right to vote as a class on a merger proposal. As a consequence, even though less than 40% of the 7% preferred tendered their shares in response to the offer, GM Sub's combined acquisition of an overwhelming majority of both Liggett's common stock and the $5.25 Convertible Preferred gave it sufficient voting power to approve a follow-up merger proposal whereby all remaining shareholders of Liggett other than GM Sub were eliminated in return for the payment of cash for their shares. This merger was approved on August 7, 1980, and GM Sub became the sole owner of all Liggett shares. Under the terms of the merger those who remained shareholders of Liggett after the tender offer were paid the same consideration for their shares in the merger as had been offered to them in the tender offer. In other words, the remaining owners of the 7% Preferred were merged out of Liggett at $70 per share.

Based upon the foregoing facts it is the position of the plaintiff Rothschild that as a matter of law both Liggett as well as Grand Met, through GM Sub, breached a duty of fair dealing owed to the 7% Preferred shareholders. It is argued that Liggett's board of directors did so by ultimately agreeing to its takeover by Grand Met and by recommending the terms of the tender offer to Liggett's shareholders when

it had to know that insofar as the offer pertained to the 7% Preferred shareholders it was in contravention of Liggett's certificate of incorporation. As to GM Sub and Grand Met, it is charged that upon becoming the majority shareholder of Liggett as a result of the tender offer they breached the duty of fairness owed by them to the remaining minority 7% Preferred shareholders by merging them out of the corporation without paying them the stated liquidation value of their shares.

Both of the foregoing contentions—and indeed the entire theory of Rothschild's case—is based upon one premise, namely, that the combined tender offer and merger constituted a liquidation of Liggett insofar as the rights of the 7% Preferred stock were concerned, thus entitling its owners to receive the liquidation preference of $100 per share from Grand Met through its subsidiary, GM Sub. Rothschild basically offers three theories in support of this underlying premise.

For one, Rothschild points to the now-unusual features of the 7% Preferred. It came into being in 1911, a different era. Since it was not callable, not redeemable and not convertible into any other security, it was strictly a vehicle for investment at a fixed and guaranteed 7% return. According to the certificate of incorporation, the only way that its value as a share of stock could be realized to its owner was in the event of liquidation. From this Rothschild argues that those who purchased the 7% Preferred securities over the years had a reasonable expectation for believing that they could be forcibly removed as a preferred shareholder of Liggett only in the event of a liquidation, at which time they would receive $100 per share. From this Rothschild proceeds to the conclusion that any elimination of the 7% Preferred in return for the payment of its value necessarily constitutes a liquidation insofar as the 7% Preferred is concerned.

Secondly, Rothschild points to the language in Liggett's charter which created the $5.25 Convertible Preferred stock. This was an issue of preferred stock which came into being long after the 1911 authorization of the 7% Preferred. As to the $5.25 Convertible Preferred, which also carried with it certain liquidation preferences, it was specifically spelled out in language which would now appear to be standard in more modern times that a merger, a sale of assets or certain other transactions would not constitute a "liquidation" for the purpose of the liquidation rights given to the $5.25 Convertible Preferred. The charter language pertaining to the 7% Preferred contains no such exception or qualification. Thus Rothschild suggests that there is nothing within Liggett's certificate of incorporation which would prohibit a combined tender offer and merger which eliminated the 7% Preferred from being treated as a liquidation if, in fact, it amounted to one.

Thirdly, Rothschild points out that it was the announced intention of Grand Met from the outset to acquire all outstanding shares of Liggett. By accomplishing its goal through the combination of the tender offer and the follow-up merger, Grand Met, through GM Sub, acquired all of Liggett, and thus all of its assets. In return, in net effect, all of Liggett's former shareholders were paid for the value of their shares. Since the liquidation of a corporation can be accomplished by selling all of its assets, satisfying its obligations and paying the amount remaining proportionably among its shareholders according to their respective interests, Rothschild argues that in the business sense of the transaction that is precisely what happened here. Insofar as the 7% Preferred shareholders were concerned, the assets of Liggett were sold, the preferred shares were eliminated and the shareholders were given final payment for the value of their preferred shares. Thus, Rothschild would conclude that as a matter of practicality the combined transaction amounted to a liquidation and thus activated the preference rights of the 7% Preferred to receive the stated liquidation value of $100 per share.

Stated perhaps another way, Rothschild is arguing that the defendants, through the tender offer and merger, caused the 7% Preferred shareholders to be unfairly eliminated from their position in Liggett's corporate enterprise through the destruction of their liquidation rights without the payment of the $100 liquidation value called for by Liggett's charter. Viewed either way, however, I find Rothschild's position to be untenable.

■ Quite simply, no liquidation of Liggett occurred here. It still existed as a corporate entity following the tender offer and merger. It still retained shareholder status even though all shares merged in one owner. What happened was that all of its outstanding shares were acquired by a single owner. The corporation did not sell off all of its assets, pay its obligations, distribute the remaining proceeds to its shareholders and cease to exist as a corporate entity. The fact that the practical effect of the transaction as to the 7% Preferred shareholders may have been similar to the result that would have followed from a liquidation does not make the transaction a liquidation.

■ The Delaware General Corporation law recognizes the concept of a merger. It is separate and distinct from a liquidation or a sale of assets. Indeed, the argument that a good faith merger is essentially a sale of assets when it suits a plaintiff to view it as such has long since been put to rest. *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952). Moreover, it has been held that preference rights of preferred stock can be eliminated legally through the merger process.

In *Federal United Corp. v. Havender*, Del.Supr., 24 Del.Ch. 318, 11 A.2d 331 (1940) it was argued that accumulated dividends on preferred stock could not be eliminated by means of a merger because, under the circumstances there prevailing, the merger amounted to nothing more than a recapitalization of the corporation and under the prevailing law applicable to a recapitalization such action could not be taken without paying the accumulated dividend arrearage. In rejecting that argument our Supreme Court, in language that would seem obviously relevant to the present matter, stated as follows at 11 A.2d 339:

> "Consequently, in a case where a merger of corporations is permitted by law and is accomplished in accordance with the law, the holder of cumulative preference stock as to which dividends have accumulated may not insist that his right to the dividends is a fixed contractual right in the nature of a debt, in that sense vested and, therefore, secure against attack. Looking at the law which is a part of the corporate charter, and, therefore, a part of the shareholder's contract, he has not been deceived nor lulled into the belief that the right to such dividends is firm and stable. On the contrary, his contract has informed him that the right is defeasible; and with that knowledge the stock was acquired."

■ So here, the merger provisions of the Delaware General Corporation Law necessarily form a part of Liggett's charter. Thus, the liquidation preference given the 7% Preferred under Liggett's restated certificate of incorporation, like the accumulated dividend preference in *Havender,* was always subject to the possibility of defeasance by merger, and the 7% Preferred shareholders were necessarily charged with knowledge of this at the time that they acquired their shares.

■ The preferential rights attaching to shares of preferred stock are contractual in nature and are governed by the express provisions of a corporation's charter. *Wood v. Coastal States Gas Corp.*, Del.Supr., 401 A.2d 932 (1979); *Gaskill v. Gladys Belle Oil Co.*, 16 Del.Ch. 289, 146 A. 337 (1929). Nothing is to be presumed in favor of preferences attached to stock, but rather they must be expressed in clear language. *Shanghai Power Co. v. Delaware Trust Co.*, Del.Ch., 316 A.2d 589 (1974); *Ellingwood v. Wolf's Head Oil Refining Co.*, Del.Supr., 27 Del.Ch. 356, 38 A.2d 743 (1944).

Under the express language of Liggett's charter the holders of the 7% Preferred were entitled to be paid the $100 par value of the shares only in the event of "any liquidation of the assets of the Corporation (whether voluntary or involuntary)." From this there can be no presumption that they would also be paid the par value under other circumstances. The total transfer of the ownership of the stock of the corporation through the tender offer and the follow-up merger was not a "liquidation of the assets" of the corporation, and, I think it fair to say, was never intended to be by either Liggett or by GM Sub. Therefore, no contractual liquidation right of the 7% Preferred shareholders was activated by the combined transaction, and thus no contractual right of the 7% Preferred shareholders was violated by either Liggett or by GM Sub as a result of the payment to the 7% Preferred shareholders of something less than $100 per share.

The contractual aspect of the matter highlights, I think, a significant point of distinction to be made. Closely examined, what Rothschild is arguing is that the 7% Preferred shareholders are entitled to be paid the liquidation value of their shares because *their rights* as preferred shareholders were liquidated as a result of GM Sub's acquisition. As stated by Rothschild in its reply brief, "the *interests of the 7% Preferred* Stockholders were forcibly *liquidated* under any fair and reasonable reading of the terms of Liggett's charter." And also, the "acquisition resulted in the liquidation of *their interests* in Liggett." (Emphasis added.)

In other words, Rothschild is arguing that where the preferred shareholders' rights are liquidated—i.e., their shareholder status terminated in return for the payment of cash—then the transaction by which it is accomplished should be viewed as a liquidation of the corporation itself insofar as those preferred shareholders are concerned even though the corporation continues on as an operating legal entity.

Thus, the argument is not that the corporation has liquidated, or that its assets have been liquidated, but rather it is an argument that the interests of the 7% Preferred shareholders have been liquidated. But under the contractual language of Liggett's charter the right to payment of the par value of the shares springs into being only "[i]n the event of any liquidation of the assets of the Corporation." Thus, as I view Rothschild's argument, it is not based on a right spelled out in the contractual language of the charter.

Relying on *Singer v. Magnavox Company,* Del.Supr., 380 A.2d 969 (1977), Rothschild argues that the decisions in *Havender* and *Sterling* are inapplicable here because they predated the enactment of the statutes authorizing cash-out mergers. Under the merger statutes existing at the time of those decisions, shareholders in a constituent corporation were entitled to receive an equity interest in the corporation surviving the merger. This fact was significant to the decisions reached in both *Havender* and *Sterling.* Since the former 7% Preferred shareholders of Liggett were cashed-out here and did not continue on as shareholders of GM Sub, Rothschild argues that those two decisions fail to offer support for a conclusion that no liquidation occurred in this case.

To the extent that this is meant to imply a distinction which supports the theory of Rothschild's claims, I cannot follow it. The essence of Rothschild's cause of action appears to be that the elimination of the investment rights of the 7% Preferred, whether by tender offer or merger, amounts to a liquidation of their particular interests in Liggett, thus requiring the payment of the contractual liquidation price. But if that is so, what difference does it make if the form of payment for the interest taken is made in cash or in stock of the corporation surviving the merger? Either way the shareholders are removed from their preferred stock investment. What if the 7% Preferred shareholders who were merged out had been given stock in Grand

Met worth $70 per share in return for the Liggett shares taken from them? Would this have made the transaction any less a liquidation of the interests of the 7% Preferred under Rothschild's argument?

I think not, because it seems to me that Rothschild's approach must start necessarily from the assumption that it is the total elimination of the particular investment security that mandates the payment of the stated liquidation price, regardless of the form that it takes. But to then suggest that elimination for cash constitutes a liquidation while elimination in return for a security of an equivalent current value in the surviving corporation does not, and that for that reason the decisions in *Havender* and *Sterling* are inapplicable, is, it seems to me, inconsistent. It goes only to accentuate what I feel to be the false premise in Rothschild's logic, namely, that it is the elimination of the 7% Preferred stock interest from the corporation that gives rise to the right to receive the liquidation preference and not necessarily the liquidation of the assets of the corporation as called for by the charter.

Thus, under the theory of Rothschild's case I find no basis for distinguishing *Havender* and *Sterling*. I find that these decisions are applicable and controlling here to the extent relied upon. In passing I also take note that in *Havender* our Supreme Court placed considerable reliance on the decision of the New Jersey Court of Chancery in *Windhurst v. Central Leather Co.*, N.J.Ch., 105 N.J.Eq. 621, 149 A. 36 (1930),

*affirmed,* N.J.Er. & App., 107 N.J.Eq. 528, 153 A. 402 (1931), in which it was specifically held that insofar as the rights of preferred shareholders were concerned, the merger of two corporations was not equivalent to a statutory dissolution.

Finally, I think it significant to note that Rothschild is making no charge that the $70 price offered in the tender offer and merger was inadequate or unfair in any respect other than it did not meet the stated liquidation price set forth in Liggett's charter. Thus, Rothschild's complaint has nothing to do with the fair value of the 7% Preferred as of the time of the tender offer and merger, or with the intrinsic fairness of the price offered and paid. Rather, its complaint is based strictly on the contention that there was a liquidation within the contemplation of those provisions of Liggett's certificate of incorporation which created the preference rights of the 7% Preferred. On the undisputed facts I find as a matter of law that there was none.

Accordingly, the motion of the plaintiff Rothschild for summary judgment will be denied. The motion of the defendants will be granted and summary judgment will be entered in favor of Liggett and GM Sub. A form of order may be submitted.