Southern Advanced Materials, LLC v Abrams (2023 NY Slip Op 04704)

Southern Advanced Materials, LLC v Abrams

2023 NY Slip Op 04704

Decided on September 21, 2023

Appellate Division, First Department

FRIEDMAN, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: September 21, 2023
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Barbara R. Kapnick
David Friedman, Ellen Gesmer, Lizbeth González, John R. Higgitt

Index No. 650773/15 Appeal No. 577 Case No. 2022-04949 

[*1]Southern Advanced Materials, LLC, Plaintiff-Respondent-Appellant,
v
Robert S. Abrams etc., et al., Defendants-Appellants-Respondents.

Defendants appeal and plaintiff cross-appeals from an order of the Supreme Court, New York County (Andrea Masley, J.), entered on or about October 7, 2022, which, insofar as appealed and cross-appealed from, denied plaintiff's motion for partial summary judgment and denied in part and granted in part defendants' motion for summary judgment.

DLA Piper LLP (US), New York (Megan Shea Harwick, Joseph G. Finnerty, III, Robert C. Foote III and Emma L. Kramer of counsel), for appellants-respondents.
Seiden Law LLP, New York (Amiad Kushner, Michael Stolper and Olivia Huang of counsel), for respondent-appellant.

FRIEDMAN, J. 

The primary question on this appeal is whether an acquisition of a limited liability company, which transaction was structured as a sale of 100 percent of the membership interests in the target company, may be characterized as a dissolution of the company under the terms of its operating agreement. A former preferred shareholder of the target company, seeking to recover the preferred return to which it would be entitled upon a dissolution, argues that the sale of the company's equity should qualify as a dissolution under the operating agreement because the transaction necessarily involved the transfer of control of all of the company's assets and the operating agreement provides that dissolution must occur "upon the disposition by the Company of substantially all of its assets." We are not persuaded by this argument, and therefore modify the order under review to grant defendants summary judgment dismissing the former preferred shareholder's cause of action for breach of contract. We affirm, however, the motion court's grant of summary judgment dismissing the former preferred shareholder's claim for breach of fiduciary duty.
CV Holdings, LLC (CVH), a Delaware limited liability company, was a holding company for a group of operating subsidiaries engaged in the design and manufacture of plastic products.[FN1] Defendant Robert S. Abrams, individually and as trustee of defendant Robert S. Abrams Living Trust (collectively with the trust, Abrams), who held all of CVH's Class A Common Interests, was CVH's manager and majority shareholder.[FN2] Plaintiff Southern Advanced Materials, LLC (SAM) was a holder of Class C Preferred Interests in CVH. At the time relevant to this appeal, SAM's total investment in CVH was $12.3 million, amounting to an 8.43 percent interest in the company.
The rights and obligations of CVH's shareholders among themselves are set forth in the Fourth Amended and Restated Operating Agreement, dated August 1, 2001 (the Operating Agreement). As relevant to this appeal, section 13.3(c) in Article XIII of the Operating Agreement (entitled "Dissolution and Termination") provides, in sum and substance, that, "upon dissolution of the Company,"[FN3] each preferred shareholder of CVH is entitled to a 10 percent preferred return if the amount that would otherwise have been distributed to the preferred shareholder would have provided [*2]an annual return of less than 30 percent upon that shareholder's preferred investment.[FN4]
The rights and obligations of the shareholders in connection with a sale of CVH to a third party are addressed in Article XIV of the Operating Agreement (entitled "Liquidity and Other Transfer Rights"). Section 14.4 sets forth a "Go Along Obligation," under which, in the event Abrams proposes to sell to an unrelated third party all of the Class A Common Interests, upon the satisfaction of certain conditions, the holders of all other classes of interests become obligated to sell to the same third party all of their respective interests "on the same terms and conditions as the Class A Common Members." Thus, in a situation where section 14.4 applies, all shareholders would be compensated based on their respective pro rata interests in the company, without any premium for the preferred shareholders.[FN5]
In 2011, Abrams formed SiO2 Medical Products, Inc. (SiO2) as a startup company to research and develop the production of glass-lined plastic vessels. SiO2 was set up as a separate company wholly owned by Abrams because CVH did not have the financial ability to put on its balance sheet the level of debt that SiO2 required. Pursuant to an Option/Nominee Agreement between Abrams and CVH, Abrams held legal title to SiO2 shares "for the sole and exclusive benefit of CVH" and CVH had an option to acquire SiO2 for $1 at any time that Abrams owned SiO2. In addition, as more fully discussed below, CVH held certain assets and liabilities related to SiO2. At all times relevant to this appeal, SiO2 had no marketable product and no revenues.
In December 2013, Abrams entered into negotiations with Wendel S.A. concerning Wendel's possible purchase of CVH. In the course of the negotiations, Wendel made clear to Abrams that it was not interested in acquiring CVH's assets and liabilities relating to SiO2 and that, as a precondition to the consummation of the purchase, Wendel would require CVH to divest itself of its SiO2-related assets and liabilities.
Ultimately, Abrams, Wendel, CVH, and all CVH common and preferred shareholders (including SAM) entered into a Purchase Agreement, dated December 23, 2014 (the Purchase Agreement). As more fully discussed below — and as has never been disputed — the Purchase Agreement unequivocally provided for a transaction in the form of a purchase by Wendel (through an indirect subsidiary) of all of CVH's equity interests from the shareholders for $360 million. Consistent with the transaction's equity-sale structure, the Purchase Agreement refers to the shareholders of CVH collectively as the "Sellers" and to each shareholder individually as a "Seller," but refers to CVH as the "Target," not as a seller.
Because Wendel, as previously noted, did not wish to acquire CVH's assets and liabilities related to SiO2, the Purchase Agreement provided that, before the closing of Wendel's purchase, CVH would divest itself of those assets and liabilities by transferring [*3]them to Abrams, and would cancel its option to purchase SiO2, through a "Pre-Closing Restructuring" described in a schedule to the agreement.[FN6] Before the Purchase Agreement was executed, Abrams agreed separately with each minority shareholder on the combined compensation that shareholder would receive for (i) its share of the net proceeds of Wendel's $360 million payment (about $194 million after payment of debts and transaction costs), (ii) its share of the net value of the SiO2 assets and liabilities being transferred from CVH to Abrams in the Pre-Closing Restructuring, and (iii) its share of the estimated value of CVH's option to acquire SiO2.
SAM objected on a number of grounds to the sale of CVH to Wendel on the terms negotiated by Abrams — one of which was its claimed entitlement to a preferred return pursuant to section 13.3(c) of the Operating Agreement — and rejected Abrams's initial offer of $25.8 million for its total interest in CVH. To obtain SAM's execution of the Purchase Agreement and consent to the closing of the transaction, Abrams negotiated with SAM, at arm's length, a "Retained Claims Agreement," dated November 26, 2014. The Retained Claims Agreement provides that SAM "does not accept the financial terms offered by [CVH] with respect to the [Wendel] Sale Transaction or the disposition of SiO2 . . . in the manner proposed by [CVH] and wishes to reserve its rights with respect to, inter alia, the sale transaction and disposition of SiO2 while otherwise approving the consummation of the Sale Transaction with the Purchaser [Wendel]." Accordingly, in exchange for permitting the Wendel transaction to close, SAM agreed to accept a payment of $31 million within a week of the closing and, in addition, the right to make an election among three postclosing options (the election of one such option being deemed a waiver of the other two): (i) the right to demand a payout from the deal on the most favorable terms afforded to any other minority shareholder; (ii) the right to receive a warrant to purchase $36 million of junior preferred stock in SiO2; and (iii) the right to sue Abrams on any claim against Abrams or CVH (whose liability Abrams assumed for these purposes) allegedly "arising in connection with, or relating to, the [Wendel] Sale Transaction," including SAM's claims that the aforementioned preferred return provision of section 13.3(c) of the Operating Agreement applied to the transaction.
The Pre-Closing Restructuring took place on January 28, 2015, and the Wendel transaction closed on January 29, 2015. Upon the closing, SAM received a payment of $31 million, as provided in the Retained Claims Agreement.[FN7] Of its three postclosing options under that agreement, SAM elected the option to litigate against Abrams, and commenced this action against him in March 2015.
Of the eight causes of action that SAM initially asserted against Abrams, only two were still pending at the time of the motions giving rise to the order appealed from. [*4]The two surviving claims were SAM's cause of action for breach of contract, based on its contention that it was entitled to a preferred return under section 13.3(c) of the Operating Agreement, and for breach of fiduciary duty, based on Abrams's conduct in connection with the negotiation of the Wendel transaction and of the Retained Claims Agreement. SAM moved for partial summary judgment as to liability on its breach of contract cause of action and Abrams moved for summary judgment dismissing both remaining causes of action. Supreme Court denied SAM's motion, granted Abrams's motion as to the fiduciary duty claim and denied Abrams's motion as to the breach of contract claim, leaving the latter claim to be tried. We now modify to grant Abrams's motion as to the breach of contract claim, resulting in the dismissal of the complaint.
We turn first to the breach of contract claim. As previously noted, there is actually no dispute that the Wendel transaction took the form of a sale of 100 percent of the equity interests in CVH's by the respective holders of those interests to Wendel, an unrelated buyer. The shareholders sold their respective interests in CVH to Wendel pursuant to the Purchase Agreement, to which each CVH shareholder, including SAM, was a party. As previously noted, the Purchase Agreement, while referring to the shareholders of CVH collectively as the "Sellers" and to each shareholder individually as a "Seller," refers to CVH as the "Target," not as a seller. In corporate parlance, the term "target" is used to refer to an entity sought to be acquired (see Black's Law Dictionary 432 [11th ed 2019] [defining "target corporation" as "(a) corporation over which control is being sought by another party"]).
The preamble to the Purchase Agreement, entitled "Statement of Purpose," states in pertinent part:
"WHEREAS, the Sellers [listed on the signature page] collectively own all of the outstanding equity interests (whether denominated as interests, units, common stock or preferred stock) of the Target . . .;
"WHEREAS, Buyer desires to purchase from the Sellers, and the Sellers desire to sell to Buyer, the Purchased Interests [defined as the interests in CVH set forth next to the name of each seller on a schedule], for the consideration and on the terms and subject to the conditions set forth in this Agreement[.]"
Thereafter, section 2.1 of the Purchase Agreement provides:
"2.1 Sale and Purchase of Interests. On the terms and subject to the conditions set forth in this Agreement, following the occurrence of the Pre-Closing Restructuring [to be discussed later], at the Closing, for the aggregate consideration set forth in Section 2.3, Buyer hereby agrees to purchase from each Seller, and each Seller hereby agrees to sell, transfer, convey, assign and deliver to Buyer all right, title, and interest in all of the Interests set forth next to such Seller's name on Schedule 2.1 (the 'Purchased Interests'), which Purchased Interests, in the aggregate[*5], constitute all of the issued and outstanding Interests of the Target, free and clear of all Encumbrances" (italicized emphasis added).
Similarly, in section 3.2 of the Purchase Agreement, each individual shareholder, as a "Seller," made an express representation and warranty to the buyer that it "own[ed] of record and beneficially the Interests set forth next to such Seller's name in Schedule 2.1, which constitute all of the Interests owned by such Seller." None of the shareholders could have made this representation truthfully as to CVH's assets, since those assets, as the property of CVH, were not "own[ed] of record and beneficially" by any shareholder.
As previously noted, section 13.3 of the Operating Agreement, the preferred return provision invoked by plaintiff, appears in Article XIII, which addresses the "Dissolution and Termination" of CVH. Accordingly, as plaintiff acknowledges, its right to a preferred return is triggered only in the event of CVH's dissolution. Section 13.1 of the Operating Agreement provides that a dissolution of CVH would occur either "upon the approval of the Class A Common Members holding a majority of the Class A Common Interests and Super-Majority Consent or upon the disposition by the Company of substantially all of its assets" (emphasis added). SAM contends that the transaction with Wendel constituted a dissolution under the italicized second prong of section 13.1, in that the Wendel transaction involved a "disposition . . . of substantially all of [CVH's] assets" insofar as Wendel's acquisition of CVH necessarily placed the assets owned by CVH under Wendel's control. For a number of reasons, this interpretation of section 13.1 is not plausible.
To begin, even if CVH's previous shareholders could be deemed to have "dispos[ed]" of their indirect interest in CVH's assets by selling their CVH equity to Wendel, section 13.1 provides that a dissolution of CVH occurs only upon "the disposition by the Company of substantially all of its assets" (emphasis added). Apart from the assets transferred to Abrams in the Pre-Closing Restructuring, CVH itself did not dispose of any assets when its previous shareholders sold their equity in the company to Wendel. Because CVH owned the same assets at the conclusion of the closing of the Wendel transaction that it had owned at the start of the closing, the Wendel transaction (again, apart from the Pre-Closing Restructuring) did not involve a "disposition by the Company" (emphasis added) of any of its assets, much less "substantially all of its assets." SAM's position that the Wendel transaction constituted a dissolution of CVH under section 13.1 requires it to read the phrase "by the Company" out of the provision, thereby violating the rule that "[a] reading of the contract should not render any portion meaningless" (Cortlandt St. Recovery Corp. v Bonderman, 31 NY3d 30, 39 [2018] [internal quotation marks omitted], quoting Beal Sav. Bank v Sommer, 8 NY3d 318, 324 [2007]; see [*6]also Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572, 581 [2017] ["Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements"]; Western & S. Life Ins. Co. v U.S. Bank N.A., 209 AD3d 6, 13 [1st Dept 2022] [same]).[FN8]
Moreover, SAM proves too much by its argument that a sale of 100 percent of CVH's equity to a third party qualifies as a "disposition . . . of substantially all of [CVH's] assets" and, therefore, constitutes a dissolution under section 13.1 of the Operating Agreement. SAM's position implies that any sale by the shareholders of CVH as an entity — which would necessarily result in the transfer to the buyer of control of the assets owned by CVH — should be treated as a dissolution triggering the preferred shareholders' right to a preferred return under section 13.3. However, as previously noted, the compensation of the shareholders in the event of a sale of CVH to a third party (as opposed to a dissolution) is expressly addressed in Article XIV of the Operating Agreement. Specifically, section 14.4, entitled "Go Along Obligation," provides, in sum and substance, that, in the event of a sale of all of the equity of CVH to a third party, the shareholders are entitled to receive their respective pro rata shares of the sale proceeds — without the payment of any premium to the preferred shareholders.[FN9] SAM's broad reading of section 13.1 is untenable because it would render section 14.4 "meaningless or without force or effect" (Nomura, 30 NY3d at 581 [internal quotation marks omitted]). Yet another ground for rejecting SAM's reading of section 13.1 is evident. Under Article XIII of the Operating Agreement, a dissolution of CVH entails a process of "Winding Up, Liquidation and Distribution of Assets," as detailed in section 13.2. Specifically, in the event of a dissolution, the manager (defendant Abrams) is required to sell or liquidate any remaining assets, to discharge all liabilities, and to distribute any remaining amounts to the shareholders. After the completion of the winding-up process, the manager is required by section 13.4 to file articles of dissolution with the Delaware secretary of state, whereupon, pursuant to section 13.5, "the existence of the Company shall cease." In the Wendel transaction, however, Abrams and the shareholders did not, and indeed could not, carry out the winding-up process prescribed by the Operating Agreement, for the simple reason that they no longer owned CVH, which had been acquired — lock, stock and barrel — by Wendel.[FN10]
To lend a veneer of plausibility to its argument that CVH was dissolved, SAM focuses on the aforementioned Pre-Closing Restructuring, under which, on the day before the Wendel transaction closed, CVH's SiO2-related assets and liabilities, which Wendel did not wish to acquire, [*7]were transferred from CVH to Abrams, simultaneous with the cancellation of CVH's option to acquire SiO2. As previously discussed, as of the date on which the transaction closed (January 29, 2015), SiO2 had no revenue and no marketable product. SAM's dissolution argument draws no support from the fact that, the day before Wendel acquired 100 percent of CVH's equity for $360 million, CVH divested itself of certain assets and liabilities that Wendel was not interested in buying. Critically, SAM makes no argument that the property that CVH disposed of in the Pre-Closing Restructuring constituted "substantially all of [CVH's] assets" within the meaning of section 13.1 of the Operating Agreement and Delaware law (see Gimbel v Signal Cos., Inc., 316 A2d 599, 606 [Del Ch 1974] [holding that "substantially all" of a company's assets means assets "quantitatively vital to the operation of the corporation" and "affect(ing) the existence and purpose of the corporation"], affd 316 A2d 619 [Del 1974]).
Further, contrary to the motion court's apparent view, the question of whether CVH continued to operate after the Wendel transaction is irrelevant to the question of whether that transaction itself constituted a dissolution of CVH. After the Wendel transaction closed, SAM no longer had any interest in CVH as an entity and any postclosing decision made by Wendel (which is not a party to this action) to reorganize the corporate structure it had purchased would have had no effect on SAM's rights or interests. Whether or not SAM is entitled to a preferred return under section 13.3 of the Operating Agreement depends entirely on whether a dissolution of CVH occurred while SAM was still a shareholder of CVH, which it ceased to be upon the closing of the Wendel transaction. As previously discussed, on this record, there is no question that, up until the moment of the closing, CVH continued to be an intact and operating limited liability company.
Indeed, the Purchase Agreement expressly mandated that CVH be conveyed to Wendel as an intact, viable, operating entity. Under section 6.1 of the Purchase Agreement, Abrams covenanted to Wendel that, "until the Closing," he would
"(x) conduct the business of the Companies [defined as CVH and its subsidiaries] in the ordinary course of business consistent with past practice; and (y) use commercially reasonable efforts to maintain and preserve intact the current organization, business and franchise of the Companies and to preserve the rights, franchises, goodwill and relationships of their employees, customers, lenders, suppliers, regulators and others having business relationships with any of the Companies."
Abrams further covenanted in section 6.1 of the Purchase Agreement that, until the closing, he would
"cause the Companies not to [among other things]: (a) fail to preserve and maintain all of their Permits; (b) fail to pay their debts, material Taxes and other obligations prior to becoming delinquent; (c) fail to maintain the [*8]properties and assets owned, operated or used by them in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear; [and] (d) fail to continue in full force and effect all Insurance Policies (or obtain other policies with comparable coverage at renewal), except as required by applicable Law; . . . (q) divest, sell, transfer, . . . or otherwise dispose of . . . any asset of any Company, other than the sales of products or services in the ordinary course of business consistent with past practice; (r) adopt a plan or agreement of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other material reorganization of any of the Companies . . ." (emphasis added).
Similarly, CVH itself in Article IV of the Purchase Agreement made representations and warranties to Wendel, "as of the date hereof and as of the Closing Date" (emphasis added), concerning its own and its subsidiaries' corporate organization, capitalization and authority.
In view of the foregoing, whatever postclosing actions Wendel may have taken with respect to CVH organizational existence or structure could not have retroactively converted its purchase of CVH's equity into a dissolution under the terms of the Operating Agreement. Moreover, it is inconceivable that Wendel would have paid $360 million on the closing date to obtain ownership of an entity that had already been dissolved. In this regard, it should be noted that, under Delaware law, "the transferable character of stocks is destroyed by dissolution" (Gamble v Penn Valley Crude Oil Corp., 104 A2d 257, 260 [Del Ch 1954]). It should also be borne in mind that the Delaware Chancery Court and the Delaware Supreme Court have rejected a similar attempt by a preferred shareholder to mischaracterize a transaction involving the transfer of stock as a dissolution in order to trigger dissolution preference rights (see Rothschild Intl. Corp. v Liggett Group Inc., 463 A2d 642 [Del Ch 1983] [a preferred shareholder's contractual right to a preferred return upon liquidation was not triggered by a cash-out merger], affd 474 A2d 133 [Del 1984]).
In sum, the present record establishes that no "dissolution" of CVH, under Delaware law and section 13.1 of the Operating Agreement, occurred before the closing of the Wendel transaction, at which point plaintiff ceased to be a shareholder of CVH. Accordingly, SAM cannot prevail on its claim to recover a preferred return under section 13.3 of the Operating Agreement, and defendants are entitled to summary judgment dismissing that claim.
This brings us to SAM's last remaining cause of action, the claim for breach of fiduciary duty. In the order appealed from, Supreme Court granted Abrams summary judgment dismissing this claim. This was the correct disposition, as none of the theories SAM adduces to support its fiduciary duty claim can bear scrutiny.
Contrary to SAM's contention in the motion court and upon appeal, [*9]in negotiating the Wendel transaction, Abrams had no fiduciary obligation to structure the deal as a sale by CVH of substantially all of its assets that, as previously discussed, would have constituted a dissolution under section 13.1 of the Operating Agreement and thereby triggered the preferred return provision of section 13.3(c), a purely contractual right of the preferred shareholders (see In re Trados Inc. Shareholder Litig., 73 A3d 17, 39 [Del Ch 2013] ["A board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights"]; MCG Capital Corp. v Maginn, 2010 WL 1782271, *15, 2010 Del Ch LEXIS 87, *55 [Del Ch, May 4, 2010, No. 4521-CC] ["when preferred shareholders assert fiduciary claims that relate to obligations expressly treated by their unique contractual rights with the corporation, the Court will review those claims as breach of contract claims and the claims for breach of fiduciary duty will be dismissed as superfluous"]). Nor can SAM challenge for the first time on appeal the fairness of CVH's $360 million price-tag that Abrams negotiated with Wendel (see American Infertility of N.Y., P.C. v Verizon N.Y., Inc., 195 AD3d 460, 461 [1st Dept 2021]).[FN11]
Finally, Abrams did not owe SAM any fiduciary duties in the arm's length, and obviously adversarial, negotiation of the Retained Claims Agreement (see Prairie Capital III, L.P. v Double E Holding Corp., 132 A3d 35, 52 [Del Ch 2015] [ "In an arms' length contractual setting . . . a party has no affirmative duty to speak"]; Addy v Piedmonte, 2009 WL 707641, *17, 2009 Del Ch LEXIS 38, *58 [Del Ch, Mar. 18, 2009] ["Bargained-for commercial relationships between sophisticated parties do not give rise to fiduciary duties"]). That agreement, which SAM negotiated with the advice of counsel, expressly recites that SAM "d[id] not accept the financial terms offered by [CVH] with respect to the [Wendel] Sale Transaction or the disposition of SiO2 . . . and wishe[d] to reserve its rights with respect to, inter alia, the sale transaction and disposition of SiO2." SAM reserved such rights by bargaining for an option, which it ultimately exercised, to sue Abrams personally for additional compensation after the Wendel transaction closed. Plainly, no relationship of trust and confidence existed between Abrams and SAM with respect to the subject matter of the Retained Claims Agreement. Accordingly, Abrams was entitled to summary judgment dismissing the breach of fiduciary duty claim.
Accordingly, the order of Supreme Court, New York County (Andrea Masley, J.), entered on or about October 7, 2022, which, insofar as appealed from, granted Abrams's motion for summary judgment to the extent of dismissing SAM's cause of action for breach of fiduciary duty and denied Abrams's motion insofar as it sought dismissal of SAM's cause of action for breach of contract, and denied SAM's motion [*10]for partial summary judgment as to liability on its cause of action for breach of contract, should be modified, on the law, to grant Abrams's motion as to SAM's cause of action for breach of contract, and otherwise affirmed, with costs. The Clerk is directed to enter judgment in favor of Abrams dismissing the complaint.
Order, Supreme Court, New York County (Andrea Masley, J.), entered on or about October 7, 2022, modified, on the law, to grant Abrams's motion for summary judgment dismissing plaintiff's cause of action for breach of contract, and otherwise affirmed, with costs. The Clerk is directed to enter judgment in favor of Abrams dismissing the complaint.
Opinion by Friedman, J. All concur.
Kapnick, J.P., Friedman, Gesmer, González, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: September 21, 2023

Footnotes

Footnote 1: CVH's primary operating subsidiaries included CSP Technologies, Inc., Capital Plastic Products LLC, Capital Insulated Products Inc. and Capital Europe S.A.

Footnote 2: Although CVH is a limited liability company, we refer to holders of equity interests in the company as "shareholders" for ease of reference.

Footnote 3: Article I of the Operating Agreement defines the term "Company" to mean CVH.

Footnote 4: The relevant provisions of Article XIII are as follows:
"13.1 Dissolution. The Company shall be dissolved upon the approval of the Class A Common Members holding a majority of the Class A Common Interests and Super-Majority Consent or upon the disposition by the Company of substantially all of its assets.

"13.2 Winding Up, Liquidation and Distribution of Assets.

"a. Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

"b. If the Company is dissolved and its affairs are to be wound up, the Manager shall:

Sell or otherwise liquidate all of the Company's assets . . . as promptly as practicable . . . ;

Allocate any profit or loss resulting from such sales to the Members in accordance with Article IX hereof;

Discharge all liabilities of the Company, including liabilities to Members who are creditors, to the extent otherwise permitted by law, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company;

Distribute any remaining amounts . . . to the Members in the order set forth in Section 9.7(c) . . . .

"13.3 Payment of Preferred Return . . .

"c. If (A) the Company dissolves and its assets are to be distributed pursuant to Section 13.2 and (B) the amount to be distributed related to such dissolution and Section 9.7(c) (iii) or Section 13.2(b)(iv) (to the extent it relates to Section 9.7(c)(iii)) to each Preferred Member in respect of its Preferred Interests is less than the Minimum IRR Shortfall Amount at such time, then there shall accrue and become immediately due and payable to each Preferred Member an amount equal to the Preferred Return . . . for the particular Preferred Member."

The Operating Agreement defines the term "Minimum IRR Shortfall Amount" to mean, in substance, an amount that would provide a preferred shareholder, as of the date of its distribution, with "an annual internal rate of return to such Preferred Member of thirty percent (30%) with respect to such Member's investment in its Preferred Interests . . . ." The Preferred Return for a Class C Preferred Member such as SAM is defined by the Operating Agreement as "an amount computed like interest at the rate of ten percent (10%) per annum . . . on each Preferred Member's Capital Contribution for its Class C Preferred Interests from the dates contributed until such relevant date."

Footnote 5: In pertinent part, section 14.4 provides:
"14.4 Go Along Obligation.

"a. Obligation to Participate in Certain Sales. . . . [E]ach Class B Common Member and Preferred Member agrees for the benefit of the Company and the Class A Common Member [Abrams] that if . . . the Class A Common Members shall propose to consummate any sale of all of the Class A Common Interests held by them to any person or group of persons unaffiliated with Abrams or any of the other Class A Members (collectively, the 'Go-Along Person') . . . then (at the option of the Class A Common Members exercisable by written notice to each Class B Common Member and Preferred Member) each Class B Common Member and Preferred Member shall be obligated severally to dispose of all its Class B Common Interests and Preferred Interests to the Go-Along Person on the same terms and conditions as the Class A Common Members . . . and to take any actions reasonably requested by the Class A Common Members necessary or desirable to effect such proposed sale on terms consistent with provisions of this Section."

Footnote 6: Section 7.1(d) of the Purchase Agreement lists as one of the conditions to the closing of the sale that "Sellers shall have completed the Pre-Closing Restructuring." Similarly, section 6.12 of the Purchase Agreement sets forth CVH's covenant that it "shall consummate the Pre-Closing Restructuring at or prior to the Closing."

Footnote 7: Abrams's expert in this litigation estimates that the total net value to be distributed after the closing (comprising the net proceeds of Wendel's payment for CVH's equity, the value of CVH's cancelled option to acquire SiO2, and the net value of the SiO2-related assets transferred to Abrams) was $257 million, 8.43 percent of which was $21.7 million, $9.3 million less than the $31 million payout that SAM actually received. SAM's expert disputes this conclusion. For purposes of deciding this appeal, we need not resolve this issue.

Footnote 8: Although the Operating Agreement is governed by Delaware law, the parties have not brought to our attention any material difference between New York law and Delaware law with respect to the principles of the construction of contracts.

Footnote 9: SAM admits in its second amended complaint that section 14.4, where applicable, "requires pro rata distribution of the sale proceeds [from a sale of CVH's equity] among each of the members [of CVH]."

Footnote 10: There is no merit to SAM's assertion that the winding-up requirements of Article XIII apply only to a dissolution occurring pursuant to a vote of shareholders (which plaintiff does not contend took place here). The Operating Agreement applies the same requirements to a dissolution pursuant to a shareholder vote and to a dissolution occurring by reason of the sale of substantially all of the company's assets.

Footnote 11: Before the motion court, SAM challenged only the structure of the transaction and the allocation of the proceeds, not the price that Wendel paid.